**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

**El Paso Division**

EDGAR ULLOA LUJAN;

SAMAR AHMAD;

*Plaintiffs*,

v.

U.S. DEPARTMENT OF EDUCATION;          CIVIL CASE NO. 3:22-CV-00159-DCG

MIGUEL CARDONA, Secretary, U.S.
Department of Education, in his official
capacity;

MICHELLE ASHA COOPER, Assistant
Secretary for Postsecondary Education, U.S.
Department of Education, in her official
capacity;

*Defendants*.

**<u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................. i

TABLE OF AUTHORITIES ......................................................................... iii

PRELIMINARY STATEMENT .......................................................................1

STATEMENT OF FACTS ...............................................................................2

   I.    STATUTORY AND REGULATORY BACKGROUND .................................2

   II.   ED'S NATIONALITY-CONSCIOUS EVALUATION PROCESS............................5

   III.  ED APPLIED ITS NATIONALITY-CONSCIOUS EVALUATION PROCESS TO REJECT MS. AHMAD'S 2021 APPLICATION ....................................7

   IV.  ED'S NATIONALITY-CONSCIOUS EVALUATION CRITERION WILL AGAIN PREJUDICE MS. AHMAD'S 2022 APPLICATION ................................9

ARGUMENT ..................................................................................................9

   I.    MS. AHMAD IS LIKELY TO PREVAIL ON THE MERITS ......................9

   A.   ED'S NATIVE-LANGUAGE PENALTY VIOLATES THE CONSTITUTION'S GUARANTEE OF DUE PROCESS AND EQUAL PROTECTION ...........................10

      1.   *ED's Native-Language Penalty Is Subject to Strict Scrutiny Because It Overtly Discriminates Based on National Origin*....................................................... 11

      2.   *ED's Native-Language Penalty Does Not Serve a Compelling Government Interest*............................................................................................. 13

      3.   *ED's Native-Language Penalty Is Not Narrowly Tailored* ...................................... 15

   B.   ED MISINTERPRETED ITS STATUTORY AUTHORIZATION TO JUSTIFY THE NATIVE-LANGUAGE PENALTY ........................................................17

      1.   *ED's Interpretation of 'Foreign Language Training' Is Inconsistent with the Text and Purpose of the Fulbright-Hays Act* .......................................... 18

      2.   *ED's Misinterpretation of Foreign Language Training Is Based on Its Mistaken Belief that Individuals Cannot Be Trained in U.S. Schools in Their Native Language* ...................................................................................... 20

      3.   *The Native-Language Penalty Undermines Modern Foreign Language Training and Area Studies of Teachers and Prospective Teachers in U.S. Schools* .................. 22

   II.   MS. AHMAD WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION..............................................................25

i

III. HARM TO MS. AHMAD FAR OUTWEIGHS ANY INCONVENIENCE TO ED ........26

IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST.......................27

CONCLUSION ..........................................................................................28

CERTIFICATE OF SERVICE ...............................................................30

# TABLE OF AUTHORITIES

Pages(s)

**CASES**

*Arnold v. Barbers Hill Indep. Sch. Dist.*,
   479 F. Supp. 3d 511 (S.D. Tex. 2020) ...............................................................................25

*Asian Am. Bus. Grp. v. City of Pomona*,
   716 F. Supp. 1328 (C.D. Cal. 1989) ..................................................................................12

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020) .................................................................................................. 8, 11

*Bourgeois v. U.S. Coast Guard*,
   151 F. Supp. 3d 726 (W.D. La. 2015) ..............................................................................12

*BST Holdings LLC v. OSHA*,
   17 F.4d 604 (5th Cir. 2021) ..............................................................................................25

*City of El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018)..............................................................................................9

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ..........................................................................................................14

*Davis v. Passman*,
   442 U.S. 228 (1979) ..........................................................................................................10

*EEOC v. WC&M Enterprises, Inc.*,
   496 F.3d 393 (5th Cir. 2007)............................................................................................12

*Fisher v. Univ. of Tex. at Austin*,
   570 U.S. 297 (2013) .................................................................................................. 13, 15

*G&V Lounge, Inc. v. Michigan Liquor Control Comm'n*,
   23 F.3d 1071 (6th Cir. 1994)............................................................................................28

*Gratz v. Bollinger*,
   539 U.S. 244, 273 (2003)......................................................................................11, 15, 16

*Grutter v. Bollinger*,
   288 F.3d 732 (6th Cir. 2002)..................................................................................... 11, 15

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
   804 F.2d 1390 (5th Cir. 1986) .........................................................................................25

*Huynh v. Carlucci*,
   679 F. Supp. 61 (D.D.C. 1988) ............................................................................... 10, 13

*Killebrew v. City of Greenwood, Miss.*,
   988 F. Supp. 1014 (N.D. Miss. 1997) .................................................................... 26, 28

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .......................................................................................................20

*La. Publ. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986).........................................................................................................17

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993).........................................................................................................26

*Republican Party of Minnesota v. White*,
    536 U.S. 765 (2002).........................................................................................................16

*Sambrano v. United Airlines, Inc.*, 2022 WL 486610, (5th Cir. Feb. 17, 2022) ...............................26

*Sandifer v. U.S. Steel Corp.*,
    571 U.S. 220 (2014).........................................................................................................18

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
    980 F.3d 157 (1st Cir. 2020), *cert. granted*, 142 S. Ct. 895 (2022)................................10

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021)............................................................................................27

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973).........................................................................................................10

*United States v. Mead Corp.*,
    533 U.S. 218 (2001).........................................................................................................20

*Vitolo v. Guzman*,
    999 F.3d 353 (6th Cir. 2021)..................................................................................... 10, 14

*Wisconsin Cent. Ltd. v. United States*,
    138 S. Ct. 2067 (2018) .............................................................................................. 18, 19

**STATUTES**

22 U.S.C. § 2451......................................................................................................................... 2, 19

22 U.S.C. § 2452...................................................................................................................... passim

42. U.S.C. § 2000............................................................................................................................ 26

50 U.S.C. § 1902............................................................................................................................. 19

**REGULATIONS**

29 C.F.R. § 1606.1 .......................................................................................................................... 11

34 C.F.R § 662.10 ............................................................................................................................. 5

34 C.F.R. § 662.1 .............................................................................................................................. 3

34 C.F.R. § 662.21 ................................................................................................................... passim

iv

34 C.F.R. § 662.3 ........................................................................................ 3, 7

34 C.F.R. § 662.33 (1997) ......................................................................... 3, 4

34 C.F.R. Part 100........................................................................................ 26

*Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship Program*,
    63 Fed. Reg. 46,358 (Aug. 1, 1998) .............................................. passim

**OTHER AUTHORITIES**

"Foreign," Merriam-Webster, https://www.merriam-webster.com/dictionary/foreign ................ 18

Boren Awards, Campus Representatives, Roles and Resources,
    https://www.borenawards.org/campus-representatives ........................................... 20

## PRELIMINARY STATEMENT

Plaintiffs move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction by August 1, 2022, enjoining Defendants from applying 34 C.F.R. § 662.21(c)(3) to penalize Plaintiff Samar Ahmad for acquiring a Arabic through her national heritage when evaluating her 2022 application for the Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship. Plaintiffs state as follows:

The Department of Education ("ED" or "Department") rejected Plaintiff Samar Ahmad's 2021 application for the Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship ("Doctoral Fellowship") on the basis of her Arabic-speaking heritage. Specifically, ED docked her 15 points for the language-proficiency portion of the application solely because Arabic is the language of her national heritage. This 15-point "native-language penalty" was large enough to knock Ms. Ahmad out of the running despite her near-perfect scores in the remaining portions of the application.

ED introduced the native-language penalty in a 1998 regulation to give a competitive advantage to native-born applicants against "non-native born United States citizens or resident aliens," whom it said must "acquire an additional foreign language" instead of using their native languages to apply for the Doctoral Fellowship. ED, *Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship Program*, 63 Fed. Reg. 46,358, 46,359 (Aug. 1, 1998) ("1998 Final Rule"). The 15-point penalty essentially disqualifies such "non-native born" students who apply for the Doctoral Fellowship from conducting research in any country that speaks the language of their national heritage. As such, it unconstitutionally discriminates against applicants based on their national origin. The penalty also violates the Doctoral Fellowship's authorizing statute, which instructs ED to administer the fellowship to "promot[e] modern foreign language training and area

1

studies in United States schools, colleges, and universities" without any mention of prioritizing applicants based on their national heritage. 22 U.S.C. § 2452(b)(6).

In April 2022, Ms. Ahmad reapplied for the Doctoral Fellowship in 2022 and will face the same unlawful and unconstitutional native-language penalty. ED may issue a final award decision based on Ms. Ahmad's national heritage as early as August 2022.[1] The Court should therefore preliminarily enjoin ED from applying the native-language penalty against Ms. Ahmad's 2022 application before that award decision can be made.

## STATEMENT OF FACTS

### I. STATUTORY AND REGULATORY BACKGROUND

In 1961, Congress enacted the Mutual Education and Cultural Exchange Act, also known as the Fulbright-Hays Act, "to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange." 22 U.S.C. § 2451. The Act authorizes the President to establish foreign-exchange programs for the purpose of "promoting modern foreign language training and area studies in United States schools, colleges, and universities by supporting visits and study in foreign countries by teachers and prospective teachers in such schools, colleges, and universities for the purpose of improving their skill in languages and their knowledge of the culture of the people of those countries." *Id.* § 2452(b)(6).

Pursuant to this authority, ED established the Doctoral Fellowship to support U.S. doctoral candidates, who are "prospective teachers," to conduct dissertation research overseas using a

---

[1] The Department announced the results of 2020 applications for the Doctoral Fellowship in early August 2020. *See* ECF 1-9 (August 2020 email exchange between ED and Georgetown University discussing ED's award decisions of Georgetown applicants). ED announced the results of 2021 applications on September 12, 2021. *See* Declaration of Samar Ahmad ¶ 7 ("Ahmad Decl.") (attached as Exhibit 1).

foreign language. Other types of Fulbright-Hays programs support the study abroad of, *inter alia*, university faculty and high school teachers. "Under the [Doctoral Fellowship] program, the Secretary [of Education] awards fellowships, through institutions of higher education, to doctoral candidates who propose to conduct dissertation research abroad in modern foreign languages and area studies." 34 C.F.R. § 662.1. An applicant is eligible if he or she is: (1) a citizen or permanent resident of the United States; (2) a doctoral student in a program in modern foreign languages and area studies in a U.S. institute of higher education; (3) planning a teaching career in the United States after completing the doctorate; and (4) in possession of "sufficient foreign language skills to carry out the dissertation research project." *Id.* § 662.3.

In accordance with the Fulbright-Hays Act's purpose of "promoting modern foreign language training and area studies," ED uses foreign-language proficiency as an important evaluation criterion in awarding the Doctoral Fellowship. Prior to 1998, ED evaluated applicants' foreign-language proficiency by asking whether "[t]he applicant possesses adequate foreign language skills to carry out the proposed project." 34 C.F.R. § 662.33(b)(2)(ii) (1997). The applicant's national origin was irrelevant under the pre-1998 regulation.

In 1998, ED issued a Final Rule revising its nationality-neutral regulation to evaluate "[t]he applicant's proficiency in one or more of the languages (*other than English and the applicant's native language*) of the country or countries of research." 63 Fed. Reg. at 46,363 (codifying 34 C.F.R. § 662.21(c)) (emphasis added). The 1998 Final Rule explicitly requires ED to consider the applicant's national origin. If the foreign language to be used in the research comes from the applicant's national heritage, then the applicant may not use that language to support his or her application.

3

In issuing this nationality-conscious regulation, ED explained that because Fulbright-Hays "programs were originally intended to enhance the foreign language competence of individuals trained in American schools, the criteria would be modified to give greater emphasis to having acquired a foreign language." *Id.* at 46,359. This explanation rests upon the incorrect assumption that applicants who speak a foreign language as their native language cannot be subsequently "trained in American schools" in that language. ED added that "excluding . . . the applicant's native language . . . would encourage non-native born United States citizens or resident aliens to acquire an additional foreign language." *Id*. This statement reveals ED's apparent ignorance that bilingual native-born citizens can also speak a foreign language as their native language and confirms that ED intended the native-language penalty to be imposed on any student whom ED *perceived* to be "non-native born." According to ED, such "a student conducting research in his or her native language should not enjoy the advantage in the competition that the [then-current nationality-neutral] regulations provide." *Id.* at 46,360.

One commenter to the 1998 Final Rule objected to ED's "emphasis in the selection criteria on the use of an acquired (*i.e*., non-native) foreign language. It was the commenter's view that the purpose of the program is to provide support for the development of high-end expertise in languages other than English regardless of the method of acquisition." *Id.* ED responded that "[t]he purpose of the Doctoral Dissertation Research Abroad Fellowship Program (DDRA) is primarily to support students conducting research overseas in non-native languages other than English." *Id.* The authorizing statute, however, draws no distinction between native- and non-native foreign languages. It merely authorized the establishment of programs to "promot[e] *modern* foreign language training and area studies in United States schools." 22 U.S.C. § 2452(b)(6) (emphasis added). Nor did ED's prior regulation distinguish between native and non-native language. 34

4

C.F.R. § 662.33(b)(2)(ii) (1997). The 1998 Final Rule thus redefined the purpose of the Doctoral Fellowship to penalize native speakers of foreign languages.

## II.     ED'S NATIONALITY-CONSCIOUS EVALUATION PROCESS

Since 1998, ED has used the nationality-conscious regulation at 34 C.F.R. § 662.21(c) as part of its evaluation process in awarding the Doctoral Fellowship. Applicants apply through the institution of higher education in which they are enrolled. *Id.* § 662.10. The Secretary then selects awardees among the applicants based on a 106-point scale that looks at three categories of selection criteria: (1) quality of the research project, which is worth 60 points; (2) qualifications of the applicant, which is worth 40 points; and (3) priorities that the Secretary of Education may establish each year, which is worth 6 points. ECF 1-1 at 6-8 ("Application Instructions").[2] The first two categories of selection criteria are derived verbatim from the Department's regulation at 34 C.F.R. § 662.21(b) and (c).

Within the 40-point "Qualification of the Applicant" category are the following four selection criteria derived from 34 C.F.R. § 662.21(c):

- Criterion 1: "The overall strength of the applicant's graduate academic record," which is worth up to 10 points.

- Criterion 2: "The extent to which the applicant's academic record demonstrates strength in area studies relevant to the proposed project," which is worth up to 10 points.

- Criterion 3: "The applicant's proficiency in one or more of the languages (other than English and the applicant's native language) of the country or countries of research, and the specific measures to be taken to overcome any anticipated language barriers," which is worth up to 15 points.

- Criterion 4: "The applicant's ability to conduct research in a foreign cultural context," which is worth up to 5 points.

---

[2] ED used a 105-point scale prior to 2022, when it changed the 5-point "Secretary's priorities" category into a 6-point category. *See* 87 Fed. Reg. 5,804 (Feb. 2, 2022). Ms. Ahmad's 2021 application was evaluated on a 105-point scale.

ECF 1-1 at 7-8.

Criterion 3, which evaluates the applicant's foreign-language proficiency, is given the most weight (15 points) within the "Qualification of the Applicant" category. The regulation at 34 C.F.R. § 662.21(c) expressly disqualifies "the applicant's native language" from being used to satisfy foreign-language proficiency. The Department's Application Instructions confirm that "in our regulations under § 662.21(c)(3), native speakers are not eligible for points [for] Criterion 3 under 'Qualifications of the Applicant[.]'" ECF 1-1 at 10. The Application Instructions further define a "native speaker" as "a person who has spoken the language in question from earliest childhood and remains fluent in that language." *Id.*

ED also has special rules for "heritage speakers" of a foreign language that are purportedly derived from 34 C.F.R. § 662.21(c)(3)—although that regulation makes no distinction between "native" and "heritage" speakers. ED's Application Instructions define heritage speaker as "a student who is raised in a home where a non-English language is spoken, who speaks or merely understands the heritage language, and who is to some degree bilingual in English and the heritage language, but lacks native level fluency in writing, speaking, and understanding in that language." ECF 1-1 at 10. A heritage speaker "may be eligible for up to 10 points" out of 15 for foreign-language proficiency. *Id.*

Due to the competitive nature of the Doctoral Fellowship, not being eligible for 15 out of 106 possible points presents an insurmountable barrier to obtaining the award. Thus, the inability for "native speakers" to score *any* of the 15 points available under the foreign-language criterion effectively disqualifies them from obtaining the Doctoral Fellowship. Heritage speakers with less-than-native fluency face a smaller, albeit still significant, penalty for speaking the language of their national heritage.

6

### III.   ED APPLIED ITS NATIONALITY-CONSCIOUS EVALUATION PROCESS TO REJECT MS. AHMAD'S 2021 APPLICATION

Plaintiff Samar Ahmad is a doctoral candidate in Georgetown University's History Department and plans to enter a teaching career in the United States after graduating. Ahmad Decl. ¶ 4. Ms. Ahmad was born in Kuwait and became a naturalized citizen of the United States in 1996, when she was 10 years old. *Id.* ¶ 3. Ms. Ahmad grew up speaking Arabic and began to learn English in pre-school. Since immigrating to the United States, Ms. Ahmad has improved her Arabic-language skills (both reading and writing) by taking courses taught in Arabic, including coursework that was part of her doctoral training at Georgetown. *Id.* ¶ 5. She satisfies all the eligibility requirements for the Doctoral Fellowship. *See* 34 C.F.R. § 662.3.

In 2021, Ms. Ahmad applied for the Doctoral Fellowship to conduct dissertation research in Jordan, which is an Arabic-speaking country. Her application was evaluated by two anonymous reviewers appointed by ED. The first reviewer gave Ms. Ahmad's 2021 application perfect or near-perfect scores in every evaluation criterion except for the 15-point foreign-language criterion. The review repeatedly recognized the value of Ms. Ahmad's Arabic language skills, stating that "[t]he applicant's native fluency in Arabic will be another plus for her … [in] conduct[ing] research in a foreign cultural context" and that "[t]he applicant's native fluency in Arabic should greatly facilitate conducting the field research." ECF 1-4 at 6. The native-language penalty nonetheless forced the first reviewer to give Ms. Ahmad 0 out of 15 points for foreign-language proficiency, explaining: "Since Arabic is the native language of the applicant, the question of language proficiency is not applicable." The first reviewer gave Ms. Ahmad a total of 84 out of 105 possible points. *Id.* at 2. If the Department's native-language penalty at 34 C.F.R. § 662.21(c)(3) had not forced the first reviewer to consider Ms. Ahmad's Arabic heritage, that reviewer would have given

Ms. Ahmad the full 15 points for foreign-language proficiency, and Ms. Ahmad would have received a total of 99 out of 105 possible points.

Ms. Ahmad's second reviewer also gave her 2021 application perfect or near-perfect scores in every evaluation criterion except for the 15-point foreign-language criterion. The second reviewer gave her 0 out of 15 points for the foreign-language criterion because "the applicant identifies as a native speaker of Arabic." ECF 1-5 at 6. The second reviewer gave Ms. Ahmad a total of 82 out of 105 possible points. *Id.* at 2. If the Department's native-language penalty at 34 C.F.R. § 662.21(c)(3) had not forced the second review to considered Ms. Ahmad's Arabic heritage, that reviewer would have given Ms. Ahmad the full 15 points for foreign-language proficiency, and Ms. Ahmad would have received a total of 97 out of 105 possible points.

The Department denied Ms. Ahmad's application based on scores of 84 and 82 and further rejected Georgetown University's request for reevaluation to correct an "oversight," explaining that even an upward adjustment (presumably to the high 80s) would not place her in the range of award or alternate status. *See* ECF 1-6 at 2. But if the reviewers did not rely on Ms. Ahmad's Arabic heritage to give her 0 out of 15 points for her Arabic language proficiency, they would have awarded her 99 and 97 points, respectively. Such scores would have placed Ms. Ahmad well within the range of being awarded the Doctoral Fellowship.[3] The Department therefore denied Ms. Ahmad's 2021 application because of her Arabic heritage. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) ("[C]ausation is established whenever a particular outcome would not have happened 'but for' the purported cause.").

---

[3] In 2020, a Georgetown student who scored 99 and 96 was awarded the Fulbright-Hays Doctoral Fellowship. *See* ECF 1-9 at 2.

IV.     **ED'S NATIONALITY-CONSCIOUS EVALUATION CRITERION WILL AGAIN PREJUDICE MS. AHMAD'S 2022 APPLICATION**

In April 2022, Ms. Ahmad reapplied for the Doctoral Fellowship to conduct dissertation research in Jordan, an Arabic-speaking country. *See* Ahmad Decl. ¶ 8. Neither ED's nationality-conscious regulation at 34 C.F.R. § 662.21(c)(3) nor Ms. Ahmad's Arabic heritage has changed. Ms. Ahmad's 2022 application will therefore be subject to the same native-language penalty that caused ED to reject her 2021 application. A preliminary injunction is needed to prevent Ms. Ahmad's application from being prejudiced a second time by ED's native-language penalty.

## ARGUMENT

"To be entitled to a preliminary injunction, the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018). Because all four factors weigh strongly in Plaintiffs' favor, this Court should grant the Motion for Preliminary Injunction.

### I.   MS. AHMAD IS LIKELY TO PREVAIL ON THE MERITS

Ms. Ahmad is likely to prevail on the merits because the native-language penalty at § 662.21(c)(3) clearly violates the U.S. Constitution's guarantees of due process and equal protection. It also exceeds the Fulbright-Hays Act's authorization for ED to establish the Doctoral Fellowship to "promot[e] modern foreign language training and area studies in United States schools, colleges, and universities." 22 U.S.C. § 2452(b)(6).

9

## A.  ED's Native-Language Penalty Violates the Constitution's Guarantee of Due Process and Equal Protection

The native-language penalty is unconstitutional because it treats applicants' national origin as a decisive factor in access to federal education assistance. "While the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 n.5 (1973) (cleaned up). "In numerous decisions, [the Supreme] Court has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws." *Davis v. Passman*, 442 U.S. 228, 234 (1979) (collecting cases). Under those equal-protection principles, "[d]iscrimination on the basis of national origin is subject to strict scrutiny and can be sustained only if there is a close relationship between the classification and promotion of a compelling interest, the classification is necessary to achieve that interest, and the means or procedures employed are precisely tailored to serve that interest." *Huynh v. Carlucci*, 679 F. Supp. 61, 66 (D.D.C. 1988) (first citing *Plyler v. Doe*, 457 U.S. 202, 217 (1982); and then citing *In re Griffiths*, 413 U.S. 717, 721-22 (1973)). This "is a very demanding standard, which few programs will survive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (preliminarily enjoining federal assistance program that prioritized certain races and ethnicities over others).

This straightforward case involves none of the complexities that often plague equal-protection cases in the education context. Such cases sometimes require courts to search for hidden motives because a defendant is alleged to use facially neutral metrics, such as subjective rating of applicants' personalities, to achieve discriminatory outcomes. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157 (1st Cir. 2020), *cert. granted*, 142 S. Ct. 895 (2022). Not so here. ED has promulgated a regulation that brazenly admits to disparate treatment based on "the applicant's native language," 34 C.F.R. § 662.21(c)(3), which falls within

the federal government's own definition of national-origin discrimination, 29 C.F.R. § 1606.1 ("defin[ing] national origin discrimination broadly as including, but not limited to, the denial of equal [] opportunity … because an individual has the … linguistic characteristics of a national origin group."). ED's reviewers also openly admit that Ms. Ahmad's Arabic heritage was the sole reason for her ineligibility to receive points under the foreign-language criterion. ECF 1-4 at 6 (awarding 0 out of 15 points "[s]ince Arabic is the native language of the applicant"); ECF 1-5 at 6 (awarding no points because "the applicant identifies as a native speaker of Arabic").

Next, courts in some equal-protection cases may find it difficult to evaluate the extent to which difficult-to-measure "plus factors" based on suspect classifications caused specific application outcomes. *See Grutter v. Bollinger*, 288 F.3d 732, 796 (6th Cir. 2002) (Boggs., J., dissenting from en banc decision) ("I cannot believe that a 'plus' of any size, no matter how large, would be therefore constitutional."). Here, ED simplified that inquiry by imposing an easy-to-measure 15-point penalty, which is large enough to ensure that any native speaker will be rejected. *See Gratz v. Bollinger*, 539 U.S. 244, 273 (2003) (holding that the assignment of "decisive" point values based on suspect classification was unconstitutional in college admissions). There is no dispute that Ms. Ahmad would have scored within the range of being awarded the fellowship in 2021 "but for" the decisive 15-point penalty. ECF 1 at ¶ 74; *see also Bostock*, 140 S. Ct. at 1739.

1.  *ED's Native-Language Penalty Is Subject to Strict Scrutiny Because It Overtly Discriminates Based on National Origin*

The native-language penalty under § 662.21(c)(3) discriminates against Ms. Ahmad based on her national origin and is therefore subject to strict scrutiny, which it fails. All Doctoral Fellowship applicants who apply to research in an Arabic-speaking country may use their Arabic language skills to satisfy the 15-point foreign-language criterion unless, as with Ms. Ahmad, "the applicant's native language" is Arabic. 34 C.F.R. § 662.21(c)(3). ED's reviewers confirmed that

11

they imposed a 15-point penalty on Ms. Ahmad's 2021 application solely because Arabic is her native language. ECF 1-4 at 6; ECF 1-5 at 6.

"[T]he use of foreign languages is clearly an expression of national origin." *Asian Am. Bus. Grp. v. City of Pomona*, 716 F. Supp. 1328, 1332 (C.D. Cal. 1989). As such, disparate treatment based on native language "overtly discriminates on the basis of national origin" and is thus subject to strict scrutiny. *Id.* In the employment context, the federal government's own regulations define national-origin discrimination to include the denial of equal opportunity "because an individual has the physical, cultural or *linguistic characteristics* of a national origin group." *EEOC v. WC&M Enterprises, Inc*., 496 F.3d 393, 401 (5th Cir. 2007) (quoting 29 C.F.R. § 1606.1) (emphasis added); *see also, e.g.*, *Bourgeois v. U.S. Coast Guard*, 151 F. Supp. 3d 726, 735 (W.D. La. 2015) ("it is clear to this Court that … one of the defining features discussed in the jurisprudence is … linguistic characteristics of the national origin group.").

Arabic is obviously a linguistic characteristic of Ms. Ahmad's Arabic heritage, and therefore ED's disparate treatment of Ms. Ahmad based on her native language is national-origin discrimination. ED dispelled any doubt about its discriminatory motivation when it equated native speakers of a foreign language against whom the 15-point penalty is assessed to "non-native-born United States citizens or resident aliens." 63 Fed. Reg. at 46,359.[4] In other words, the penalty is designed to be assessed against individuals whom ED perceives to be non-native-born with the express aim of "encouraging" them not to apply for the Doctoral Fellowship in any country that speaks their native language. *Id.*

---

[4] Many bilingual Americans have acquired a foreign language through their national heritage despite being "native born."

Such overt discriminatory motivation for changing a nationality-neutral regulation to a nationality-conscious one is subject to strict scrutiny. *Huynh*, 679 F. Supp. at 62. In *Huynh*, naturalized citizens challenged the Defense Department's revision of its prior, nationality-neutral regulation to deny security clearances to naturalized U.S. citizens from listed countries who do not meet duration-of-residency requirements. *Id.* at 66. Reasoning that "but for their national origin, plaintiffs would be accorded the same individualized security clearance evaluation given all other United States citizens," the court applied strict scrutiny to preliminarily enjoin the Defense Department's nationality-conscious regulation. *Id.* An injunction based on strict scrutiny is likewise appropriate here because, but for Ms. Ahmad's Arabic heritage, her 2022 application would be accorded the same individualized evaluation as all other eligible applicants.

2. *ED's Native-Language Penalty Does Not Serve a Compelling Government Interest*

The first step of strict scrutiny asks whether the government has a compelling interest to discriminate based on a suspect classification. The Supreme Court has made clear that "the *only* interest that this Court has approved in [the education] context" to justify national origin discrimination is "the benefits of a student body diversity that 'encompasses a … broa[d] array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.'" *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 314-315 (2013) (quoting *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 315 (1978) (opinion of Powell, J.)). ED's failure to invoke the "only … approved" interest of diversity,[5] *id.*, should be the beginning and end of the inquiry under strict scrutiny.

---

[5] Nor could ethnic diversity be relevant in the context of awarding the Doctoral Fellowship because recipients travel to different countries and do not constitute some sort of student body that could enjoy "educational benefits that diversity is designed to produce." *Grutter*, 539 U.S. at 330.

ED instead asserts its "purpose … is primarily to support students conducting research overseas in non-native languages other than English." 63 Fed. Reg. at 46,360. Specifically, the native-language penalty is designed "to give greater emphasis" to supporting students who "acquired a foreign language" in American schools and to discourage "non-native born United States citizens or resident aliens" from applying for the Doctoral Fellowship in any country that speaks their native language. *Id.* at 46,359. According to ED, "a [non-native born] student conducting research in his or her native language should not enjoy the advantage in the competition that the [previous nationality-neutral] regulations provide[d]." *Id.* The goal therefore is to give preference to native-born students to balance against an advantage that ED perceives non-native born students to have. The Supreme Court, however, has made clear that preferential treatment of a suspect class by the federal government serves a compelling interest in only extremely narrow circumstances: the policy must be a remedy for a specific period of past intentional discrimination in which the federal government was at least a passive participant. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492-94 (1989) (plurality opinion). Because none of these elements is present, ED lacks a compelling governmental interest in giving native-born students preferential access to federal financial assistance. *See Vitolo*, 999 F.3d at 362 ("conclud [ing] that the government lacks a compelling interest in awarding [financial assistance] based on the race [or ethnicity] of the applicants.").

3.  *ED's Native-Language Penalty Is Not Narrowly Tailored*

Even if ED's asserted interest in prioritizing students who acquire a foreign language in U.S. schools (as opposed to through their national heritage) were a compelling interest, the native-language penalty is not narrowly tailored to advance that interest.

To start, assigning a decisive point value to an applicant's race or ethnicity is inconsistent with narrow tailoring. *Gratz*, 539 U.S. at 247. The *Gratz* Court held that adding 20 points to every favored racial group—with 100 points needed to guarantee admission—was impermissible because it "makes race a decisive factor for virtually every minimally qualified underrepresented minority applicant." *Id.*. ED's 15-point penalty based on national heritage creates the same problem in reverse. It is unconstitutionally decisive because it lowers a native speaker's maximum score to 90 out of 105, which is below the award range for the Doctoral Fellowship. *See* ECF 1-6 at 2 (refusing to upwardly adjust Ms. Ahmad's 2021 scores to remedy an "oversight" because her scores of 82 and 84 are "not within the funding or alternate status range with or without the adjusted score.").

Additionally, for a policy to pass narrow-tailoring analysis, ED must show "serious, good faith consideration of workable [nationality]-neutral alternatives," *Grutter*, 539 U.S. at 339, and the court may not uphold a nationality-conscious policy unless it is "satisf[ied] that no workable [nationality]-neutral alternative" would achieve the compelling interest, *Fisher*, 570 U.S. at 312. Nothing in the 1998 Final Rule suggested that ED considered nationality-neutral methods of achieving its asserted goal of promoting foreign-language acquisition in U.S. schools.

ED did not consider non-discriminatory methods for the simple reason that discrimination based on national origin was its intended purpose. One way to conduct narrow-tailoring analysis is to ask whether a policy is either overbroad or underinclusive in its use of suspect classifications.

*Gratz*, 539 U.S. 244, 273-75 (2003). An underinclusive policy suggests a disingenuous asserted purpose being used as a pretext for unconstitutional action. *Republican Party of Minnesota v. White*, 536 U.S. 765, 779-80 (2002). In *White*, the Court found a statute that prohibited judicial candidates from expressing views—but allowed such expression before declaring candidacy or after being elected—was so underinclusive of the stated purpose of advancing judicial open-mindedness "as to render belief in that purpose a challenge to the credulous." *Id.* Here, ED claims to have imposed the native-language penalty to prioritize students who acquired foreign languages in U.S. schools. 63 Fed. Reg. at 46,359. But national heritage is merely one of many ways a person could acquire a foreign language outside of U.S. schools. Individuals could also acquire foreign languages through, for example, private tutors, traveling overseas, or attending a school outside of the United States. Yet, ED does not penalize students who acquire foreign languages through these other methods and instead exclusively targets students it perceives to be "non-native born." 63 Fed. Reg. at 46,359. Such a "woefully underinclusive" policy raises question about ED's true motive. *White*, 536 U.S. at 779.

ED revealed its true motive in a response to a commenter who suggested ED should support high-end expertise in foreign languages regardless of the method of acquisition: "a student conducting research in his or her native language should not enjoy the advantage in the competition that the [previous nationality-neutral] regulations provide." 63 Fed. Reg at 46,361. In other words, the native-language penalty has nothing to do with promoting language acquisition in U.S. schools, as compared to other methods. Rather, ED perceived certain "non-native born" Americans to have an advantage based on their national heritage—*i.e.*, having a foreign native language—and imposed a decisive penalty to offset that perceived advantage. That is textbook invidious discrimination that violates Ms. Ahmad's constitutional right to equal protection.

16

**B.  ED MISINTERPRETED ITS STATUTORY AUTHORIZATION TO JUSTIFY THE NATIVE-LANGUAGE PENALTY**

Even if the native-language penalty's asserted purpose of promoting foreign-languages acquisition in U.S. schools were not pretext for ED's unconstitutional motive, the penalty would still be unlawful because it is not authorized under the Fulbright-Hays Act.

"[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Publ. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). ED introduced the native-language penalty based on its assertion that "[t]he purpose of the Doctoral Dissertation Research Abroad Fellowship Program (DDRA) is primarily to support students conducting research overseas in non-native languages other than English." 63 Fed Reg. at 46,360. But nothing in the authorizing statute distinguishes between native and non-native languages. Rather, the Doctoral Fellowship is established under 22 U.S.C. § 2452(b)(6), which authorizes ED to "promot[e] modern foreign language training and area studies in United States schools, colleges, and universities by supporting visits and study in foreign countries by teachers and prospective teachers in such schools, colleges, and universities for the purpose of improving their skill in languages and their knowledge of the culture of the people of those countries."

ED used the 1998 Final Rule to reinterpret Congress's instruction to promote "foreign language training" to mean promote training in "non-native languages other than English." 63 Fed. Reg. at 46,360. This interpretation improperly supplants the plain-meaning definition of "foreign language" as any language not indigenous to a country (here, United States) with any language not derived from an individual's national heritage. The Court must not defer to and should instead reject this misinterpretation, which appears to be based on ED's conflating the concepts of foreign-language *training* with foreign-language *acquisition*. The native-language penalty based on ED's misinterpretation is not only unauthorized, but it actively undermines Congress's instruction for

17

ED to use the Doctoral Fellowship to "promot[e] modern foreign language training and area studies" of "teachers and prospective teachers" in U.S. schools. 22 U.S.C. § 2452(b)(6). The Court should therefore enjoin the native-language penalty based on ED's misinterpretation of "foreign language training."

1. *ED's Interpretation of 'Foreign Language Training' Is Inconsistent with the Text and Purpose of the Fulbright-Hays Act*

The native-language penalty rests on ED's 1998 reinterpretation of its authorization in 22 U.S.C. § 2452(b)(6) to support "foreign language training" to mean supporting training only "in non-native languages other than English." 63 Fed Reg. at 46,360. Under this view, Ms. Ahmad's native language of Arabic is not a "foreign language" within the meaning of § 2452(b)(6) and thus she is not eligible for points under the foreign-language proficiency criterion. But that atextual interpretation is wholly inconsistent with the text and purpose of the Fulbright-Hays Act and must be rejected.

Statutory interpretation begins (and often ends) with the ordinary meaning of the text. "It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *see also Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) ("As usual, our job is to interpret the words consistent with their ordinary meaning[.]") (cleaned up). The ordinary meaning of "foreign" is being "characteristic of some place or country other than the one under consideration."[6] A "foreign language" is therefore a language that is not indigenous to the country in question. For the United States, that means any non-English language.

---

[6] "Foreign," Merriam-Webster, https://www.merriam-webster.com/dictionary/foreign (last visited June 22, 2022).

Whether a language is "foreign" must be answered by referencing a specific country, not the national origin of an individual speaker. For example, when one hears Swedish tourists in the United States speaking their language, it is commonly understood that the tourists are speaking a foreign language because Swedish is not indigenous to the United States. ED's interpretation turns this commonsense understanding on its head and would conclude that Swedish is not a foreign language. Nothing in the text of the Fulbright-Hays Act of 1961 suggested Congress intended to adopt such an "idiosyncratic definition" of foreign language. *Wisconsin Cent.*, 138 S. Ct. at 2073. To the contrary, a country-centric rather than individual-centric concept of foreign language is reinforced by the Act's purpose "to increase mutual understanding between *the people of the United States* and *the people of other countries* by means of educational and cultural exchange," 22 U.S.C. § 2451 (emphasis added). Such mutual understanding is promoted by improving the training in U.S. schools of languages that are spoken by "people of other countries" and are not spoken by "the people of the United States." Again, that means non-English modern languages, which obviously includes Ms. Ahmad's native language of Arabic.

Other federal agencies that support foreign-language training notably do not define "foreign language" based on an individual speaker's national origin but rather base it on whether the language is indigenous to the United States. The Boren Fellowship administered by the Defense Department, for instance, is authorized to support overseas study of "foreign languages, area studies, counterproliferation studies, and other international fields relating to the national security interests of the United States." 50 U.S.C. § 1902(a)(1)(B)(i). Unlike ED, the Defense Department adopts the ordinary meaning of foreign language based on the country in which the language is

indigenous,[7] and it celebrates rather than discourages immigrants and children of immigrants who seek to study the foreign language of their national heritage.[8] *See* ECF 1 ¶¶ 54-56. The same is true of the State Department's Critical Language Scholarship. *Id.* ¶¶ 57-59.

In short, ED's definition of "foreign language training" under the Doctoral Fellowship's authorizing statute to mean only training in "non-native" languages is inconsistent with the plain meaning of the text, the statutory purpose, and how other agencies interpret the same phrase. The Court must not defer to ED's tortured interpretation because "the terms of the congressional delegation [in § 2452(b)(6)] give no indication that Congress meant to delegate authority" to ED to define the meaning of "foreign language." *United States v. Mead Corp.*, 533 U.S. 218, 231 (2001). Moreover, the concept of foreign language has an easily understood plain meaning. "If uncertainty does not exist, there is no plausible reason for deference." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Rather, the Court must reject ED's unsupported interpretation, and the native-language penalty based on it.

2. *ED's Misinterpretation of Foreign Language Training Is Based on Its Mistaken Belief that Individuals Cannot Be Trained in U.S. Schools in Their Native Language*

ED followed the plain meaning of "foreign language training" as training in any language not indigenous to the United States until the 1998 Final Rule. The 1998 rule, however, adopted a new definition of foreign language, as ED explained in a formal response to a commenter's objection to the native-language penalty. 63 Fed Reg. at 46,360. The new definition, which

---

[7] *E.g.,* Boren Awards, Campus Representatives, Roles and Resources, https://www.borenawards.org/campus-representatives (last visited June 22, 2022) (Noting that "Boren Awards give preference to applicants who plan to study languages indigenous to preferred African countries.").

[8] The Boren Program boasts that "alumni come from diverse ethnic and socioeconomic backgrounds, including … heritage language speakers and naturalized U.S. citizens." *Id.*

required ED to explicitly consider an applicant's national origin, was not supported by any reference to the statutory text. Instead, ED offered the following illogical explanation: "Since [Fulbright-Hays] programs were originally intended to enhance the foreign language competence of individuals *trained* in American schools, the [evaluation] criteria would be modified to give greater emphasis to having *acquired* a foreign language." *Id.* at 46,359 (emphases added).

ED uses "acquired" as a term of art to refer to exposure and initial learning of a language in a U.S. school. Native speakers who acquire a foreign language through their national heritage, as opposed to a school, do not "acquire" the language within ED's meaning of the term. *Id.* at 46,359 (characterizing native-language penalty as placing "emphasis in the selection criteria on the use of an acquired (*i.e.*, non-native) foreign language"). This unexplained fixation on language acquisition in U.S. schools appears to be based a misreading of § 2452(b)(6)'s instruction for the Doctoral Fellowship to "promot[e] modern foreign language training … in United States schools." ED apparently believes that, because native speakers acquire their foreign language through their national heritage rather than American schools, they somehow cannot be subsequently "trained in American schools" and thus do not fall within the statute's instruction to promote training in U.S. schools. 63 Fed. Reg. at 46,359. That view is clearly wrong because U.S. students who acquire a foreign language from their national heritage can—and many do—receive training in U.S. schools in their native language.

Foreign-language *acquisition*, as ED defines it, is different from the foreign-language *training* that Congress instructed ED to promote. Whereas acquisition occurs once, training is the continual process of improving one's proficiency in a language that one has already acquired. Importantly, acquiring a language from one's national heritage presents no barrier to subsequently being trained in American schools in that same language. U.S. students who speak English as their

21

native language, for example, do not acquire English from school. Yet, they obviously can and do receive English language training in American schools. A U.S. student who speaks a foreign language as their native language can likewise receive training in that language from an American school.

Indeed, Ms. Ahmad received significant training in her native language of Arabic in U.S. schools, including at Georgetown University's Center for Contemporary Arab Studies, before she applied for the Doctoral Fellowship in 2021. *See* ECF 1 ¶ 63; Ahmad Decl. ¶ 5. She and countless Americans like her stand as living, breathing examples of ED's error. No matter how many courses these immigrants or children of immigrants take in American schools to improve their proficiency in the language of their national heritage, ED refuses to see them as "individuals trained in American schools" whom the Doctoral Fellowship is designed to support. 63 Fed. Reg. at 46,359. Such a nonsensical—and frankly offensive—position cannot support limiting the "foreign language training" ED is required to promoted under § 2452(b)(6) to mean training in an applicant's non-native languages.

3. *The Native-Language Penalty Undermines Modern Foreign Language Training and Area Studies of Teachers and Prospective Teachers in U.S. Schools*

ED's fixation with foreign language acquisition as opposed to training is especially indefensible in the context of the Doctoral Fellowship, which requires dissertation research in a foreign language and therefore a high level of proficiency. Initial acquisition of a foreign language at a U.S. school—the promotion of which is the proffered purpose of ED's native-language penalty—obviously would not allow a student to conduct doctoral-level research in that language. Rather, what matters is that recipients have advanced language skills. Immigrants and children of immigrants who are trained in American schools to achieve advanced skills in their native language, such as Ms. Ahmad, are an obvious pool of qualified candidates. ED's use of the native-

language penalty to categorically disqualify such individuals trained in American schools from receiving support from the Doctoral Fellowship is patently inconsistent with Congress's explicit instruction for ED to establish the Doctoral Fellowship to promote their training.

What's more, the native-language penalty actively discourages individuals who acquired a foreign language through their national heritage from pursuing additional training in that language at U.S. schools. A child of immigrants who acquires a foreign language through his or her national heritage and then pursues foreign-language training at a U.S. doctoral program to achieve a high level of fluency in that language will be deemed a "native speaker" who will receive 0 out of 15 points under the native-language penalty. ECF 1-1 at 10. But if the same student avoids training, he or she will be classified as a less-fluent "heritage speaker" who is entitled to up to up to 10 out of 15 points. *Id.* In other words, ED is actively discouraging immigrants and children of immigrants from pursuing additional training in their native language. This is, of course, the opposite of Congress's instruction to "promot[e] modern foreign language training … in United States schools[.]" 22 U.S.C. § 2452(b)(6).

The native-language penalty also contravenes Congress's instruction for ED to administer the Doctoral Fellowship to "promot[e] … area studies in United States schools[.] *Id.* According to ED, "excluding … the applicant's native language [from being eligible for points] … would encourage non-native born United States citizens or resident aliens to acquire an additional foreign language." 63 Fed. Reg. at 46,359. Not so. Acquiring additional foreign languages from U.S. schools cannot change Ms. Ahmad's Arabic national heritage, which is the basis of the penalty. Even if she acquired 20 additional foreign languages, Ms. Ahmad would still be subject to an insurmountable 15-point penalty if she applies to use the Doctoral Fellowship to conduct dissertation research in any Arabic-speaking country, from Morocco to Oman. The only way for

Ms. Ahmad to avoid the penalty is to apply to study in a non-Arabic speaking country. Thus, to the extent the native-language penalty "encourage[s] non-native born United States citizens or resident aliens," it encourages them to not pursue dissertation research in any area of the world that speaks their native language. Such discouragement is anathema to Congress's instruction for ED to establish a Doctoral Fellowship that "promot[es] … area studies in United States schools[,]" and therefore is not authorized by the Fulbright-Hays Act.

Finally, the native language penalty violates Congress's authorization in 22 U.S.C. § 2452(b)(6) to promote the training of only "teachers and prospective teachers" by "supporting [their] visits and study in foreign countries." *Id.* These "teachers and prospective teachers" would "improv[e] their skill in languages and their knowledge of the culture of the people of those countries" and then return to train new generations of U.S. students. To the extent the native-language penalty promotes any foreign-language training, it does so in an entirely unauthorized way: by encouraging students to acquire—*i.e.*, learn for the first time—foreign languages in a school setting, as opposed to through their national heritage. 63 Fed. Reg. at 46,359.

The individuals whose foreign-language acquisition the native-language penalty purports to promote, by definition, have not yet acquired the language in question. They therefore can have no concrete plans to study abroad in a country that speaks that language, let alone improve their skills and teach in U.S. schools after their study, as Congress intended in 22 U.S.C. § 2452(b)(6). Put simply, Congress tasked ED to promote the foreign-language training of "teachers and prospective teachers," and ED instead issued a regulation that purports to promote the training of novices. While introducing novices to new languages may be an important policy goal, it is not one Congress authorized ED to pursue using programs established under § 2452(b)(6).

At bottom, the native-language penalty rests upon ED's untenable interpretation of "foreign language training" in § 2452(b)(6) to mean training in an individual's non-native language. That interpretation ignores the plain meaning of statutory text and is based on ED's indefensible belief that immigrants and their children categorically cannot receive training in their native language from U.S. schools. This erroneous interpretation, and the native-language penalty it spawned, actively undermines § 2452(b)(6)'s requirement for ED to administer the Doctoral Fellowship to promote foreign language training and area studies of teachers and prospective teachers in U.S. schools. Thus, even if ED's application of the native-language penalty against Ms. Ahmad somehow survives strict scrutiny, the Court must still enjoin it for violating the Doctoral Fellowship's authorizing statute.

## II.  MS. AHMAD WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable. The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986) (footnotes omitted). Constitutional violations "for even minimal periods of time … unquestionably constitutes irreparable injury." *BST Holdings LLC v. OSHA*, 17 F.4d 604, 618 (5th Cir. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). That "includes violation of rights under the Equal Protection Clause." *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020) (citing *Killebrew v. City of Greenwood, Miss*., 988 F. Supp. 1014, 1016 (N.D. Miss. 1997)). And, as the Supreme Court has held, mere subjection to a facially discriminatory evaluation process is sufficient to establish a constitutional harm, regardless of whether the plaintiff would have received the benefit in the absence of the discrimination. *Ne. Fla.*

*Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

The court in *Killbebrew* issued a preliminary injunction based, in part, on its finding that a "promotional system [that] is based upon race and not solely upon merit" poses "a substantial threat of irreparable injury." 988 F. Supp. at 1016. ED's evaluation scheme for language proficiency is even worse because it is not even partially based upon merit. In 2021, ED's evaluation of Ms. Ahmad's foreign language proficiency was not based at all upon her actual proficiency in the relevant foreign language and was instead based solely upon her Arabic heritage. ECF 1-4 at 6; ECF 1-5 at 6. The same penalty will be assessed against Ms. Ahmad's 2022 application, in violation of Ms. Ahmad's constitutional right to equal protection. ED is required by Title VI of the Civil Rights Act of 1964 to protect students such as Ms. Ahmad from unlawful discrimination based on their national origin. *See* 42. U.S.C. § 2000d ("No person in the United States shall, on the ground of … national origin … be subjected to discrimination under any program or activity receiving Federal financial assistance."); *see also* 34 C.F.R. Part 100 (ED regulations enforcing Title VI). It instead decided to engage in discrimination. That discriminatory treatment constitutes textbook irreparable injury because "'[d]ollars and cents' cannot capture the damage that the government inflicts when it deprives rights that it exists to defend." *Sambrano v. United Airlines, Inc*., 2022 WL 486610, at *16 (5th Cir. Feb. 17, 2022) (quoting *BST Holdings*, 17 F.4th at 618) (Smith, J., dissenting).

### III. HARM TO MS. AHMAD FAR OUTWEIGHS ANY INCONVENIENCE TO ED

The irreparable injury that Ms. Ahmad will suffer without a preliminary injunction far outweighs any inconvenience that would befall ED if the Court grants interim relief. All that is

requested of ED is for it to evaluate Ms. Ahmad's 2022 application without considering her national heritage. Even assuming this minimal intrusion constitutes some sort of burden, the deprivation of Ahmad's constitutional right to equal protection vastly outweighs any administrative inconvenience to ED.

Indeed, a preliminary injunction is likely to lighten the administrative burden on ED. Absent a preliminary injunction, ED will use its unconstitutional native-language penalty to evaluate Ms. Ahmad's 2022 application, which likely will result in her otherwise meritorious application being rejected in favor of a less-qualified applicant. When that discriminatory policy is ruled unconstitutional and unlawful, ED will be forced to re-evaluate Ms. Ahmad's application fairly and without prejudice against her Arabic heritage. If that re-evaluation results in Ms. Ahmad being awarded the Doctoral Fellowship—which is likely given her near perfect scores in 2021— ED may have to rescind an award from a less-qualified applicant. A preliminary injunction forbidding ED from discriminating against Ms. Ahmad *before* Doctoral Fellowships are awarded, which could be as early as August 2022, would obviate that burdensome and convoluted process.

## IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST

Where, as here, the government is the opposing party, Plaintiffs' likelihood of success on the merits is a strong indicator that a preliminary injunction serves the public interest because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). An injunction prohibiting ED from penalizing Ms. Ahmad's 2022 application based on her Arabic national heritage serves the public interest because "it is always

in the public interest to prevent the violation of a party's constitutional rights." *G&V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citation omitted).

The public also has an interest in having the most qualified applicants receive Doctoral Fellowships unimpeded by invidious discrimination. *Killebrew*, 988 F. Supp. at 1016 ("The public deserves to have the most qualified fire fighters advance through the ranks of the city's fire department unimpeded by race-based promotional policies."). Applicants with the best qualifications would learn more and become better teachers to future generations of U.S. students, thus furthering 22 U.S.C. § 2452(b)(6)'s mandate to "promot[e] modern foreign language training and area studies in United States schools, colleges, and universities."

ED recognized that Ms. Ahmad's proficiency in her native language is an asset. One of Ms. Ahmad's 2021 reviewers said "[t]he applicant's native fluency in Arabic will be another plus for her … in a foreign cultural context" and "[t]he applicant's native fluency in Arabic should greatly facilitate conducting the field research." ECF 1-4 at 6. But the native-language penalty forced that reviewer to give her zero points for language proficiency in Arabic. A systematic policy that punishes applicants for having desirable qualifications for no reason other than their national heritage gravely disserves the public interest.

## **CONCLUSION**

For all these reasons, Plaintiffs respectively request that the Court grant their Motion for Preliminary Injunction before August 1, 2022, to prohibit Defendants from applying the native-

language penalty under 34 C.F.R. § 662.21(c)(3) when evaluating Ms. Ahmad's 2022 application for the Fulbright-Hays Doctoral Fellowship.

<table>
<tr><td>June 22, 2022</td><td>Respectfully submitted,</td></tr>
</table>

/s/ Sheng Li
_____

Sheng Li
*Pro Hac Vice*
John J. Vecchione
*Pro Hac Vice*
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
Sheng.Li@ncla.legal
John.Vecchione@ncla.legal

/s/ Cory R. Liu
_____

Cory R. Liu
Texas Bar No. 24098003
ASHCROFT SUTTON REYES LLC
919 Congress Ave, Suite 1325
Austin, TX 78701
(512) 370-1800
cliu@ashcroftlawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2022, an electronic copy of the foregoing was filed electronically via the Court's ECF system, which effects service upon counsel of record. In addition, a true and accurate copy of the foregoing was served via certified mail to:

Stephanie Rico, Civil Process Clerk
U.S. Attorney's Office
Western District of Texas
601 NW Loop 410, Suite 600
San Antonio, Texas 78216-5597

/s/ Sheng Li

30