**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

**El Paso Division**

EDGAR ULLOA LUJAN;

SAMAR AHMAD;

VERONICA GONZALEZ;

Plaintiffs,

v.

U.S. DEPARTMENT OF EDUCATION;

MIGUEL CARDONA, Secretary, U.S.
Department of Education, in his official capacity;

MICHELLE ASHA COOPER, Assistant
Secretary for Postsecondary Education, U.S.
Department of Education, in her official
capacity;

Defendants.

CIVIL CASE NO. 3:22-CV-00159-DCG

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................................i

TABLE OF AUTHORITIES ......................................................................................................ii

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

   I.    Statutory and Regulatory Background ...........................................................3

   II.   The Department's Nationality-Conscious Evaluation Process............................5

   III.  The Department Applied Its Nationality-Conscious Evaluation Process to Reject Ms. Gonzalez's 2022 Application.....................................................7

   IV.  Defendants' Rejection of Ms. Gonzalez's 2022 Application Threatens to Delay Her Graduation Past UC Irvine's Deadline...................................................9

   V.   Defendants' Nationality-Conscious Evaluation Process Will Again Prejudice Ms. Gonzalez's 2023 Application ...................................................10

ARGUMENT.............................................................................................................................11

   I.    Ms. Gonzalez Is Likely to Prevail on the Merits .........................................11

   A.   The Department's Native-Language Penalty Violates the Constitution's Guarantee of Due Process and Equal Protection........................................11

      1.   *The Department's Native-Language Penalty Is Subject to Strict Scrutiny Because It Overtly Discriminates Based on National Origin*........................................13

      2.   *The Department's Native-Language Penalty Does Not Serve a Compelling Government Interest* ...........................................................15

      3.   *The Department's Native-Language Penalty Is Not Narrowly Tailored* ...........................16

   B.   The Department Misinterpreted Its Statutory Authorization to Justify the Native-Language Penalty ...........................................................18

      1.   *The Department's Interpretation of 'Foreign Language Training' Is Inconsistent with the Text and Purpose of the Fulbright-Hays Act*........................................19

      2.   *The Department's Interpretation of Foreign Language Training Is Based on Its Mistaken Belief that Individuals Cannot Be Trained in U.S. Schools in Their Native Language* ...................22

      3.   *The Native-Language Penalty Undermines Modern Foreign Language Training and Area Studies of Teachers and Prospective Teachers in U.S. Schools* .........................................23

   II.   Ms. Gonzalez Will Suffer Irreparable Injury Absent a Preliminary Injunction ...................................................................................................26

   III.  Harm to Ms. Gonzalez Outweighs Any Inconvenience to the Department......28

   IV.  A Preliminary Injunction Serves the Public Interest .........................................29

CONCLUSION..........................................................................................................................29

CERTIFICATE OF SERVICE ................................................................................................30

# TABLE OF AUTHORITIES

Pages(s)

## CASES

*Arnold v. Barbers Hill Indep. Sch. Dist.*,
  479 F. Supp. 3d 511 (S.D. Tex. 2020) ............................................................................27

*Asian Am. Bus. Grp. v. City of Pomona*,
  716 F. Supp. 1328 (C.D. Cal. 1989) .............................................................................13

*Bostock v. Clayton Cnty.*,
  140 S. Ct. 1731 (2020) ............................................................................................. 9, 13

*Bourgeois v. U.S. Coast Guard*,
  151 F. Supp. 3d 726 (W.D. La. 2015) ...........................................................................14

*BST Holdings LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) .........................................................................................27

*City of El Cenizo v. Texas*,
  890 F.3d 164 (5th Cir. 2018) .........................................................................................11

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ......................................................................................................16

*Davis v. Passman*,
  442 U.S. 228 (1979) ......................................................................................................12

*EEOC v. WC&M Enters., Inc.*,
  496 F.3d 393 (5th Cir. 2007) .........................................................................................13

*Fisher v. Univ. of Tex. at Austin*,
  570 U.S. 297 (2013) ................................................................................................ 15, 17

*G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
  23 F.3d 1071 (6th Cir. 1994) .........................................................................................29

*Gratz v. Bollinger*,
  539 U.S. 244, 273 (2003) ................................................................................... 13, 16, 17

*Grutter v. Bollinger*,
  288 F.3d 732 (6th Cir. 2002) .........................................................................................13

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ........................................................................................... 13, 15, 17

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
  804 F.2d 1390 (5th Cir. 1986) .......................................................................................26

*Huynh v. Carlucci*,
  679 F. Supp. 61 (D.D.C. 1988) ............................................................................... 12, 14

*Killebrew v. City of Greenwood,*
    988 F. Supp. 1014 (N.D. Miss. 1997) .................................................................. 28, 29

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ..................................................................................................21

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ......................................................................................................18

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*
    508 U.S. 656 (1993) ......................................................................................................27

*Republican Party of Minn. v. White,*
    536 U.S. 765 (2002) .............................................................................................. 17, 18

*Sambrano v. United Airlines, Inc.,*
    No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) .................................28

*Sandifer v. U.S. Steel Corp.,*
    571 U.S. 220 (2014) ......................................................................................................20

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,*
    980 F.3d 157 (1st Cir. 2020), *cert. granted,* 142 S. Ct. 895 (2022)..........................12

*U.S. Dep't of Agric. v. Moreno,*
    413 U.S. 528 (1973) ......................................................................................................11

*United States v. Mead Corp.,*
    533 U.S. 218 (2001) ......................................................................................................21

*Vitolo v. Guzman,*
    999 F.3d 353 (6th Cir. 2021) ............................................................................... 12, 16

*Wages and White Lion Invs. LLC v. FDA,* 16 F.4th 1130, 1143 (2021) .......................29

*Wis. Cent. Ltd. v. United States,*
    138 S. Ct. 2067 (2018) .................................................................................................20

**STATUTES**

22 U.S.C. § 2451 ................................................................................................................ 3, 20

22 U.S.C. § 2452 ............................................................................................................... passim

50 U.S.C. § 1902 ....................................................................................................................21

**OTHER AUTHORITIES**

*Campus Representatives: Roles & Resources,* Boren Awards https://www.borenawards.org/campus-
    representatives (last visited Dec. 15, 2022) ........................................................21

*Foreign,* Merriam-Webster, https://www.merriam-webster.com/dictionary/foreign (last visited Dec.
    15, 2022)...............................................................................................................................20

**RULES**

Fed. R. Civ. P. 65 ....................................................................................................................1

**REGULATIONS**

29 C.F.R. § 1606.1 ...................................................................................................................12

34 C.F.R § 662.10 .....................................................................................................................5

34 C.F.R § 662.21 ..............................................................................................................passim

34 C.F.R § 662.3 ....................................................................................................................3, 7

34 C.F.R § 662.33 (1997) ......................................................................................................4, 5

*Application for New Awards; Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship Program,*
  87 Fed. Reg. 5,804 (Feb. 2, 2022) ....................................................................................10

*Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship Program,*
  63 Fed. Reg. 46,358 (Aug. 31, 1998) ...........................................................................passim

## PRELIMINARY STATEMENT

Plaintiffs move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction requiring Defendants to reevaluate Plaintiff Veronica Gonzalez's 2022 application for the Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship without applying 34 C.F.R. § 662.21(c)(3)'s "native language penalty." Plaintiffs further seek a preliminary injunction requiring Defendants to suspend § 662.21(c)(3) for the 2023 application cycle so that Ms. Gonzalez could re-apply without facing the "native language penalty." Plaintiffs state as follows:

The Department of Education ("Department") rejected Plaintiff Veronica Gonzalez's 2022 application to conduct research in Mexico under the Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship ("Doctoral Fellowship") on the basis of her national heritage. Specifically, the Department made her ineligible for any of the 15 points under the language-proficiency portion of the application solely because Spanish is the language of her national heritage. This 15-point "native-language penalty" was large enough to knock Ms. Gonzalez out of the running despite her near-perfect scores in the remaining portions of the application.

The Department introduced the native-language penalty in a 1998 regulation to give a competitive advantage to applicants whom the Department perceives to be native born against "non-native born United States citizens or resident aliens," whom it said must "acquire an additional foreign language" instead of using their native languages to apply for the Doctoral Fellowship. *Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship Program*, 63 Fed. Reg. 46,358, 46,359 (Aug. 31, 1998) ("1998 Final Rule"). The 15-point penalty essentially disqualifies such "non-native born" students and native-born students born to immigrant parents (like Ms. Gonzalez) from being awarded the Doctoral Fellowship to conduct dissertation research in any country that speaks the language of their national heritage. As such, it unconstitutionally discriminates against applicants based on their national origin. The penalty also violates the Doctoral Fellowship's authorizing statute, which instructs the

1

Department to "promot[e] modern foreign language training and area studies in United States schools, colleges, and universities" without any mention of prioritizing applicants based on their national heritage. 22 U.S.C. § 2452(b)(6).

Denial of Ms. Gonzalez's 2022 application for the Doctoral Fellowship has already delayed her dissertation research in Mexico, which she needs to graduate from her doctoral program at the University of California Irvine ("UC Irvine"). Any further delay will mean she will be unable to complete her dissertation before UC Irvine's summer 2024 deadline for finishing her doctoral program, which would put her out of good standing and jeopardize her status a doctoral candidate. A preliminary injunction requiring the Department to award the Doctoral Fellowship by March 1, 2023, is necessary to allow her to start her dissertation research on time and thus prevent this threat of irreparable harm. The Court should therefore issue a preliminarily injunction requiring the Department to immediately reevaluate Ms. Gonzalez's 2022 application without the native-language penalty and to award her the Doctoral Fellowship if the resulting score qualifies her for the award.

Ms. Gonzalez will re-apply in the 2023 application cycle for the Doctoral Fellowship if she is not awarded the Fellowship through her 2022 application. While the Department has agreed to revise 34 C.F.R. § 662.21(c)(3) through rulemaking, that process will not be complete before the 2023 application cycle begins in February. Thus, even though the Department concedes § 662.21(c)(3) should be changed, absent an injunction, that unlawful regulation will continue to apply, and Ms. Gonzalez's 2023 application will face the same unlawful and unconstitutional native-language penalty. The Court should therefore preliminarily enjoin the Department from applying § 662.21(c)(3) against any native-speaker applicant for the 2023 application cycle.

## STATEMENT OF FACTS

### I.   STATUTORY AND REGULATORY BACKGROUND

In 1961, Congress enacted the Mutual Education and Cultural Exchange Act, also known as the Fulbright-Hays Act, "to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange." 22 U.S.C. § 2451. The Act authorizes the President to establish foreign-exchange programs for the purpose of

> promoting modern foreign language training and area studies in United States schools, colleges, and universities by supporting visits and study in foreign countries by teachers and prospective teachers in such schools, colleges, and universities for the purpose of improving their skill in languages and their knowledge of the culture of the people of those countries.

*Id.* § 2452(b)(6).

Pursuant to this authority, the Department established the Doctoral Fellowship to support U.S. doctoral candidates, who are "prospective teachers," to conduct dissertation research overseas using a foreign language. Other types of Fulbright-Hays programs support the study abroad of, *inter alia*, university faculty and high school teachers. "Under the [Doctoral Fellowship] program, the Secretary [of Education] awards fellowships, through institutions of higher education, to doctoral candidates who propose to conduct dissertation research abroad in modern foreign languages and area studies." 34 C.F.R. § 662.1. An applicant is eligible if he or she is: (1) a citizen or permanent resident of the United States; (2) a doctoral student in a program in modern foreign languages and area studies in a U.S. institute of higher education; (3) planning a teaching career in the United States after completing the doctorate; and (4) in possession of "sufficient foreign language skills to carry out the dissertation research project." *Id.* § 662.3.

In accordance with the Fulbright-Hays Act's purpose of "promoting modern foreign language training and area studies," the Department uses foreign-language proficiency as an important evaluation criterion in awarding the Doctoral Fellowship. Prior to 1998, the Department evaluated applicants' foreign-language proficiency by asking whether "[t]he applicant possesses adequate foreign

language skills to carry out the proposed project." 34 C.F.R. § 662.33(b)(2)(ii) (1997), Exhibit 1. The applicant's national origin was irrelevant for decades under the pre-1998 regulation.

In 1998, the Department issued a Final Rule revising its nationality-neutral regulation to evaluate "[t]he applicant's proficiency in one or more of the languages (*other than English and the applicant's native language*) of the country or countries of research." 63 Fed. Reg. at 46,363 (codified at 34 C.F.R. § 662.21(c))(emphasis added). The 1998 Final Rule explicitly requires the Department to consider the applicant's national origin. If the foreign language to be used in the research comes from the applicant's national heritage, then the applicant may not use that language to support his or her application.

In issuing this nationality-conscious regulation, the Department explained that because Fulbright-Hays "programs were originally intended to enhance the foreign language competence of individuals trained in American schools, the criteria are modified to give greater emphasis to having acquired a foreign language." *Id.* at 46,359. This explanation rests upon the incorrect assumption that applicants who speak a foreign language as their native language cannot be subsequently "trained in American schools" in that language. The Department added that "excluding … the applicant's native language … would encourage non-native born United States citizens or resident aliens to acquire an additional foreign language." *Id.* This statement betrays the Department's ignorance that bilingual native-born citizens, like Ms. Gonzalez, can also speak a foreign language as their native language and confirms that the Department intended the native-language penalty to be imposed on any student whom the Department perceived to be "non-native born." According to the Department, such "a student conducting research in his or her native language should not enjoy the advantage in the competition that the [then-current nationality-neutral] regulations provide." *Id.* at 46,360.

One commenter to the 1998 Final Rule objected to the Department's "emphasis in the selection criteria on the use of an acquired (*i.e.*, non-native) foreign language. It was the commenter's

view that the purpose of the program is to provide support for the development of high-end expertise in languages other than English regardless of the method of acquisition." *Ibid.* The Department responded that "[t]he purpose of the Doctoral Dissertation Research Abroad Fellowship Program (DDRA) is primarily to support students conducting research overseas in non-native languages other than English." *Ibid.* . The authorizing statute, however, draws no distinction between native- and non-native foreign languages. It merely authorized the establishment of programs to "promot[e] modern foreign language training and area studies in United States schools." 22 U.S.C. § 2452(b)(6). Nor did the Department's prior regulation distinguish between native and non-native language. 34 C.F.R. § 662.33(b)(2)(ii) (1997).

## II. THE DEPARTMENT'S NATIONALITY-CONSCIOUS EVALUATION PROCESS

Since 1998, the Department has used the nationality-conscious regulation at 34 C.F.R. § 662.21(c) as part of its evaluation process in awarding the Doctoral Fellowship. Applicants apply through the institution of higher education in which they are enrolled. *Id.* § 662.10. The Secretary then selects awardees among the applicants based on a 106-point scale that looks at three categories of selection criteria: (1) quality of the research project, which is worth 60 points; (2) qualifications of the applicant, which is worth 40 points; and (3) priorities that the Secretary of Education may establish each year, which is worth 6 points. ECF 24-1 at PageID# 6-8 ("Application Instructions").[1] The first two categories of selection criteria are derived verbatim from the Department's regulation at 34 C.F.R. § 662.21(b) and (c).

Within the 40-point "Qualification of the Applicant" category are the following four selection criteria derived from 34 C.F.R. § 662.21(c):

- Criterion 1: "The overall strength of the applicant's graduate academic record," which is worth up to 10 points.

---

[1] Prior to 2022, the Department used a 105-point scale in which the Secretary's priorities were worth up to 5 points rather than 6.

- Criterion 2: "The extent to which the applicant's academic record demonstrates strength in area studies relevant to the proposed project," which is worth up to 10 points.

- Criterion 3: "The applicant's proficiency in one or more of the languages (other than English and the applicant's native language) of the country or countries of research, and the specific measures to be taken to overcome any anticipated language barriers," which is worth up to 15 points.

- Criterion 4: "The applicant's ability to conduct research in a foreign cultural context," which is worth up to 5 points.

ECF 24-1 at PageID# 7-8.

Criterion 3, which evaluates the applicant's foreign-language proficiency, is given the most weight (15 points) within the "Qualification of the Applicant" category. The regulation at 34 C.F.R. § 662.21(c) expressly disqualifies "the applicant's native language" from being used to satisfy foreign-language proficiency. The Department's Application Instructions confirm that "in our regulations under § 662.21(c)(3), native speakers are not eligible for points [for] Criterion 3 under 'Qualifications of the Applicant[.]'" ECF 24-1 at PageID# 10. The Application Instructions further define a "native speaker" as "a person who has spoken the language in question from earliest childhood and remains fluent in that language." *Ibid.*

The Department also has special rules for "heritage speakers" of a foreign language that are purportedly derived from 34 C.F.R. § 662.21(c)(3)—although that regulation makes no distinction between "native" and "heritage" speakers. The Department's Application Instructions define heritage speaker as "a student who is raised in a home where a non-English language is spoken, who speaks or merely understands the heritage language, and who is to some degree bilingual in English and the heritage language, but lacks native level fluency in writing, speaking, and understanding in that

language." ECF 24-1 at PageID# 10. A heritage speaker "may be eligible for up to 10 points" out of 15 for foreign-language proficiency. *Ibid.*[2]

Due to the competitive nature of the Doctoral Fellowship, not being eligible for 15 out of 106 possible points presents an insurmountable barrier to obtaining the award. Thus, the inability for "native speakers" to score any of the 15 points available under the foreign-language criterion effectively disqualifies them from obtaining the Doctoral Fellowship.

### III.   THE DEPARTMENT APPLIED ITS NATIONALITY-CONSCIOUS EVALUATION PROCESS TO REJECT MS. GONZALEZ'S 2022 APPLICATION

Plaintiff Veronica Gonzalez is a doctoral candidate in UC Irvine's Social Ecology Department and plans to enter a teaching career in the United States after graduating. Gonzalez Decl. ¶ 4, Exhibit 2. Ms. Gonzalez was born in Santa Maria, California, in 1983 to parents who emigrated from Mexico. *Id.* ¶ 2. Her father has a sixth-grade education from Mexico and worked as an agricultural worker in California until he became permanently disabled. *Ibid.* Her mother passed away in 2021. *Ibid.* Ms. Gonzalez grew up speaking Spanish with her family and learned English at primary school. *Id.* ¶ 3. Ms. Gonzalez improved her Spanish-language skills by taking courses in U.S. schools, including AP Spanish in high school and as part of her higher education. *Id.* ¶ 5. In 2017, she participated in the University of Southern California's Latino Mental Health Research program, which involved traveling to Mexico to take courses taught in Spanish. *Id.* ¶ 6. Ms. Gonzalez was also accepted into the Chicano Latino Emphasis Program, which requires Spanish-language coursework. *Ibid.* She satisfies all the eligibility requirements for the Doctoral Fellowship. *See* 34 C.F.R. § 662.3.

In April 2022, Ms. Gonzalez applied for the Doctoral Fellowship to conduct one year of dissertation research in Mexico, which is a Spanish-speaking country. Gonzalez Decl. ¶ 7. Her

---

[2] In accordance with the parties' July 22, 2022 stipulation in this case, Defendants made heritage-speaker applicants "eligible for up to the full 15 points on the criterion that evaluates an applicant's language proficiency" for 2022 but not future application cycles. *See* ECF 18 at 2-3.

application was evaluated by two anonymous reviewers appointed by the Department. The first reviewer gave Ms. Gonzalez's application perfect or near-perfect scores in each evaluation criterion except for the 15-point foreign-language criterion. See ECF 24-12 at PageID# 2. Even though Ms. Gonzalez is fluent in Spanish—the language in which the research would be conducted—the native-language penalty forced the first reviewer to give Ms. Gonzalez 0 out of 15 points for foreign-language proficiency, explaining: "The applicant is a native speaker of Spanish and therefore does not qualify for points in this category." *Id.* at PageID# 6. The first reviewer gave Ms. Gonzalez a total of 86 out of 105 possible points. *Id.* at PageID# 2. If 34 C.F.R. § 662.21(c)(3) had not forced the first reviewer to consider Ms. Gonzalez's Mexican heritage, that reviewer would have given Ms. Gonzalez the full 15 points for foreign-language proficiency, and Ms. Gonzalez would have received a total of 101 out of 106 points.

Ms. Gonzalez's second reviewer also gave her 2022 application perfect or near-perfect scores in each evaluation criterion except for the 15-point foreign-language criterion. The second reviewer gave her 0 out of 15 points for the foreign-language criterion because "[t]he applicant is a native speaker of Spanish and therefore does not qualify for points in this category." ECF 24-13 at PageID# 6. The second reviewer gave Ms. Gonzalez a total of 82 out of 106 possible points. *Id.* at PageID# 2. If 34 C.F.R. § 662.21(c)(3) had not forced the second reviewer to consider Ms. Gonzalez's heritage, that reviewer would have given Ms. Gonzalez the full 15 points for foreign-language proficiency, and Ms. Gonzalez would have received a total of 97 out of 106 points.

The Department denied Ms. Gonzalez's application based on scores of 86 and 82. But if the reviewers did not rely on Ms. Gonzalez's Mexican heritage to give her 0 out of 15 points for her Spanish language proficiency, they would have awarded her 101 and 97 points, respectively. Such scores would have placed Ms. Gonzalez well within the range of being awarded the Doctoral

Fellowship.[3] The Department therefore denied Ms. Gonzalez's 2022 application because of her Mexican heritage. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) ("[C]ausation is established whenever a particular outcome would not have happened 'but for' the purported cause.").

## IV. DEFENDANTS' REJECTION OF MS. GONZALEZ'S 2022 APPLICATION THREATENS TO DELAY HER GRADUATION PAST UC IRVINE'S DEADLINE

Defendants agreed to revise § 662.21(c)(3) through rulemaking to address the claims raised in this lawsuit. ECF 20 at 2. While Plaintiffs welcome rulemaking to stop discrimination based on future applicants' national heritage, such rulemaking does nothing to alleviate harms inflicted upon past applicants, including Ms. Gonzalez, whose application was denied because of her national heritage.

A one-year course of research in Mexico is integral to Ms. Gonzalez's dissertation, which she must complete and defend to finish her doctoral program. Gonzalez Decl. ¶ 10. Ms. Gonzalez needed the Doctoral Fellowship to fund that research. Defendants' rejection of her 2022 application to use the Doctoral Fellowship to conduct that research delays her work past UC Irvine's deadline for finishing her doctoral program. UC Irvine's "Maximum Time to Degree" for a Ph.D. in Social Ecology is seven years. UC Irvine Graduate School Handbook, Academic Year 2022-2023 at 8, Exhibit 3 ("Graduate School Handbook"). "Students who fail to advance prior to program deadlines are not considered in good standing," and thus are ineligible for internal funding. *Ibid.* What's worse, "[f]ailure to complete all degree requirements by the end of the seventh year may result in initiation of steps to terminate the student's status as a doctoral student." *Id.* at 24.

Ms. Gonzalez started her doctoral program in fall 2017 and therefore must complete and defend her dissertation by summer 2024 to meet UC Irvine's seven-year deadline. Gonzalez Decl. ¶ 9. In order to fit a one-year course of research in Mexico within that timeframe, Mr. Gonzalez must

---

[3] In 2020, an applicant who scored 99 and 96 was awarded the Doctoral Fellowship. *See* ECF 24-9 at PageID# 2.

receive Doctoral Fellowship funding in spring 2023. *Id.* ¶ 10. A delay of the Doctoral Fellowship will mean she cannot complete her research and defend her dissertation before the summer 2024 deadline, which will result in her loss of good standing and potential dismissal from the doctoral program. The only way for Ms. Gonzalez to maintain her good standing is to start her one-year dissertation research in Mexico in spring 2023. To do so, the Department must reevaluate her application immediately.

## V.   DEFENDANTS' NATIONALITY-CONSCIOUS EVALUATION PROCESS WILL AGAIN PREJUDICE MS. GONZALEZ'S 2023 APPLICATION

Unless Ms. Gonzalez is awarded the Doctoral Fellowship through her 2022 application, she will re-apply in the 2023 application cycle.[4] Gonzalez Dec. ¶ 11. Defendants agreed on September 8, 2022, to revise the challenged native-language penalty through rulemaking and have obtained repeated extensions, which they said "would permit the Defendants to focus their efforts on these rulemaking proceedings." *See* ECF 20 at 2. Yet, counsel for Defendants told counsel for Plaintiffs that Defendants will not be ready to propose—let alone finalize—a rule before Defendants' current deadline of January 17, 2023. So, there is no chance Defendants could propose and finalize a revised foreign-language criterion before the 2023 application cycle starts in February 2023.[5] Neither the Department's

---

[4] Awarding Ms. Gonzalez the 2023 Doctoral Fellowship will not prevent irreparable injury from her loss of good standing at UC Irvine because such awards would be made in September 2023. Even if Ms. Gonzalez could immediately start her one-year course of dissertation research in Mexico, she would not finish until fall 2024, which would be after the summer 2024 deadline for defending her dissertation.

[5] The application cycle for the Doctoral Fellowship typically opens in early February. *See Application for New Awards; Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship Program*, 87 Fed. Reg. 5,804 (Feb. 2, 2022). In 2022, the Department's February Federal Register notice published evaluation criteria, which included the foreign-language penalty under § 662.21(c)(3). *Id.* at 5,807 (listing selection criteria including "The applicant's proficiency in one or more of the languages (other than English and the applicant's native language)"). If the Department does not finalize a rule replacing § 662.21(c)(3) by the time it announces the 2023 application in February—and there is no reason to believe it would—then it will again publish evaluation critera that includes § 662.21(c)(3)'s native-language penalty.

nationality-conscious regulation at 34 C.F.R. § 662.21(c)(3) nor Ms. Gonzalez's Mexican heritage will have changed by the time the 2023 application cycle starts. A preliminary injunction is thus needed to prevent Ms. Gonzalez's 2023 application from being prejudiced a second time by the Department's unconstitutional native-language penalty.

## ARGUMENT

"To be entitled to a preliminary injunction, the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018). Because all four factors weigh strongly in Ms. Gonzalez's favor, this Court should grant the Motion for Preliminary Injunction.

## I. Ms. Gonzalez Is Likely to Prevail on the Merits

Ms. Gonzalez is likely to prevail on the merits because the native-language penalty at § 662.21(c)(3) clearly violates the U.S. Constitution's guarantees of due process and equal protection. It also exceeds the Fulbright-Hays Act's authorization for the Department to establish the Doctoral Fellowship to "promot[e] modern foreign language training and area studies in United States schools, colleges, and universities." 22 U.S.C. § 2452(b)(6).

### A. The Department's Native-Language Penalty Violates the Constitution's Guarantee of Due Process and Equal Protection

The native-language penalty is unconstitutional because it treats applicants' national origin as a decisive factor in access to federal education assistance. "While the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533 n.5 (1973) (cleaned up). "In numerous decisions, [the Supreme] Court has held that the Due Process Clause of the Fifth Amendment forbids

11

the Federal Government to deny equal protection of the laws." *Davis v. Passman*, 442 U.S. 228, 234

(1979) (collecting cases). Under those equal-protection principles,

> [d]iscrimination on the basis of national origin is subject to strict scrutiny and can be sustained
> only if there is a close relationship between the classification and promotion of a compelling
> interest, the classification is necessary to achieve that interest, and the means or procedures
> employed are precisely tailored to serve that interest.

*Huynh v. Carlucci*, 679 F. Supp. 61, 66 (D.D.C. 1988) (first citing *Plyler v. Doe*, 457 U.S. 202, 217 (1982);

and then citing *In re Griffiths*, 413 U.S. 717, 721-22 (1973)). "This is a very demanding standard, which

few programs will survive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (preliminarily enjoining

federal assistance program that prioritized certain races and nationalities over others).

This straightforward case involves none of the complexities that often plague equal-protection

cases in the education context. Such cases sometimes require courts to search for hidden motives

because a defendant is alleged to use facially neutral metrics, such as subjectively rating applicants'

personalities, to achieve discriminatory outcomes. *See Students for Fair Admissions, Inc. v. President &*

*Fellows of Harv. Coll.*, 980 F.3d 157, 168-69 (1st Cir. 2020), *cert. granted*, 142 S. Ct. 895 (2022). Not so

here. The Department promulgated a regulation that brazenly admits to disparate treatment based on

"the applicant's native language," 34 C.F.R. § 662.21(c)(3), which falls within the federal government's

own definition of national-origin discrimination, 29 C.F.R. § 1606.1 ("[D]efin[ing] national origin

discrimination broadly as including, but not limited to, the denial of equal … opportunity … because

an individual has the … linguistic characteristics of a national origin group."). The Department's

reviewers also openly admit that Ms. Gonzalez's Spanish-language heritage was the sole reason for her

ineligibility to receive points. ECF 24-12 at PageID# 6 (awarding 0 out of 15 points because "[t]he

applicant is a native speaker of Spanish and therefore does not qualify for points in this category");

ECF 24-13 at PageID# 6 (same).

Next, courts in some equal-protection cases may find it difficult to evaluate the extent to which

difficult-to-measure "plus factors" based on suspect classifications caused specific application

outcomes. *See Grutter v. Bollinger*, 288 F.3d 732, 796 (6th Cir. 2002) (Boggs, J., dissenting from en banc decision) ("I cannot believe that a 'plus' of any size, no matter how large, would be therefore constitutional."), *aff'd*, 539 U.S. 306 (2003). Here, the Department simplified that inquiry by imposing an easy-to-measure 15-point penalty, which is large enough to ensure that any native speaker will be rejected. *See Gratz v. Bollinger*, 539 U.S. 244, 273-74 (2003) (holding that the assignment of "decisive" point values based on suspect classification was unconstitutional in college admissions). There is no dispute that Ms. Gonzalez would have scored within the range of being awarded the Fellowship in 2022 "but for" the decisive 15-point penalty. ECF 24 ¶ 96; *see also Bostock*, 140 S. Ct. at 1739.

       1.   *The Department's Native-Language Penalty Is Subject to Strict Scrutiny Because It Overtly Discriminates Based on National Origin*

The native-language penalty under § 662.21(c)(3) discriminates against Ms. Gonzalez based on her national origin and is therefore subject to strict scrutiny, which it fails. All Doctoral Fellowship applicants who apply to research in a Spanish-speaking country may use their Spanish language skills to satisfy the 15-point foreign-language criterion unless, as with Ms. Gonzalez, "the applicant's native language" is Spanish. 34 C.F.R. § 662.21(c)(3). The reviewers confirmed that they imposed a 15-point penalty on Ms. Gonzalez's 2022 application solely because Spanish is her native language. ECF 24-12 at PageID# 6; ECF 24-13 at PageID# 6.

"[T]he use of foreign languages is clearly an expression of national origin." *Asian Am. Bus. Grp. v. City of Pomona*, 716 F. Supp. 1328, 1332 (C.D. Cal. 1989). As such, disparate treatment based on native language "overtly discriminates on the basis of national origin" and is thus subject to strict scrutiny. *Ibid.* In the employment context, the federal government's own regulations define national-origin discrimination to include the denial of equal opportunity "because an individual has the physical, cultural or *linguistic characteristics* of a national origin group." *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401 (5th Cir. 2007) (quoting 29 C.F.R. § 1606.1) (emphasis added); *see also, e.g., Bourgeois v. U.S.*

*Coast Guard*, 151 F. Supp. 3d 726, 735 (W.D. La. 2015) ("[O]ne of the defining features discussed in the jurisprudence is the … linguistic characteristics of the national origin group.").

Spanish is obviously a linguistic characteristic of Ms. Gonzalez's Mexican heritage, and therefore the Department's disparate treatment of Ms. Gonzalez based on her native language constitutes national-origin discrimination. The Department dispelled any doubt about its discriminatory motivation when it erroneously equated native speakers of a foreign language against whom the 15-point penalty is assessed to "non-native born United States citizens or resident aliens." 63 Fed. Reg. at 46,359. Although Ms. Gonzalez was born in California, the Department nonetheless imposed upon her a penalty that it says targets "non-native born United States citizens or resident aliens." The Department apparently does not deem Ms. Gonzalez to be a "real American" because her native language is Spanish rather than English.[6] In other words, the native-language penalty is designed to be assessed against individuals whom the Department perceives to be non-native born—even if they are in fact born in the United States—with the express aim of "encouraging" them not to apply for the Doctoral Fellowship in any country that speaks their native language. *Ibid.*

Such overt discriminatory motivation for changing a nationality-neutral regulation to a nationality-conscious one is subject to strict scrutiny. *Huynh*, 679 F. Supp. at 62. In *Huynh*, naturalized citizens challenged the Defense Department's revision of its prior, nationality-neutral regulation to deny security clearances to naturalized U.S. citizens from listed countries who do not meet duration-of-residency requirements. *Id.* at 66. Reasoning that "but for their national origin, plaintiffs would be accorded the same individualized security clearance evaluation given all other United States citizens," the court applied strict scrutiny to preliminarily enjoin the Defense Department's nationality-conscious regulation. *Ibid.* An injunction based on strict scrutiny is likewise appropriate here because,

---

[6] Many bilingual Americans, including Ms. Gonzalez, acquired a foreign language through their national heritage despite being "native born."

but for Ms. Gonzalez's Mexican heritage, her 2022 application would have been accorded the same individualized evaluation as all other eligible applicants.

      *2.   The Department's Native-Language Penalty Does Not Serve a Compelling Government Interest*

The first step of strict scrutiny asks whether the government has a compelling interest to discriminate based on a suspect classification. The Supreme Court has made clear that "the only interest that this Court has approved in [the education] context" to justify national origin discrimination is "the benefits of a student body diversity that 'encompasses a … broa[d] array of qualifications and characteristics of which racial or ethnic origin is but a single though important element.'" *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 314-15 (2013) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 315 (1978) (opinion of Powell, J.)). The Department's failure to invoke the "only … approved" interest of diversity,[7] *id.*, should be the beginning and end of the inquiry under strict scrutiny.

The Department instead asserts its "purpose … is primarily to support students conducting research overseas in non-native languages other than English." 63 Fed. Reg. at 46,360. Specifically, the native-language penalty is designed "to give greater emphasis" to supporting students who "acquired a foreign language" in American schools and to discourage "non-native born United States citizens or resident aliens" from applying for the Doctoral Fellowship in any country that speaks their native language. *Id.* at 46,359. The Department uses the term "non-native born" to include native-

---

[7] Nor could ethnic diversity be relevant in the context of awarding the Doctoral Fellowship because recipients travel to different countries and do not constitute some sort of student body that could enjoy "educational benefits that diversity is designed to produce." *Grutter*, 539 U.S. at 330. Moreover, the Supreme Court is reconsidering whether even diversity could be a compelling interest justifying discrimination based on a suspect classification. *See Students for Fair Admission v. President & Fellows of Harv. Coll.*, No. 20-1199 (U.S. *argued* Oct. 31, 2022) and *Students for Fair Admissions v. Univ. of N.C.*, No. 21-707 (U.S. *argued* Oct. 31, 2022).

born U.S. citizens, like Ms. Gonzalez, whose parents are immigrants. According to the Department, "a [non-native born] student conducting research in his or her native language should not enjoy the advantage in the competition that the [previous nationality-neutral] regulations provide[d]." *Id.* at 46,360. The goal therefore is to give preference to native-born students (unless they have immigrant parents) to offset an advantage that the Department perceives "non-native born" students to have. The Supreme Court, however, has made clear that preferential treatment of a suspect class by the federal government serves a compelling interest in only extremely narrow circumstances: the policy must be a remedy for a specific period of past intentional discrimination in which the federal government was at least a passive participant. *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492-94 (1989) (plurality opinion). Because none of these elements is present, the Department lacks a compelling governmental interest in giving native-born students preferential access to federal financial assistance. *See Vitolo*, 999 F.3d at 362 ("[C]onclud[ing] that the government lacks a compelling interest in awarding [financial assistance] based on the race [or ethnicity] of the applicants.").

### 3. *The Department's Native-Language Penalty Is Not Narrowly Tailored*

Even if the Department's asserted interest in prioritizing students who acquire a foreign language in U.S. schools (as opposed to through their national heritage) were a compelling interest, the native-language penalty would not be narrowly tailored to advance that interest.

Assigning a decisive point value to race or ethnicity is inconsistent with narrow tailoring. *Gratz*, 539 U.S. at 274. The *Gratz* Court held that adding 20 points to every favored racial group—with 100 points needed to guarantee admission—was impermissible because it "makes race a decisive factor for virtually every minimally qualified underrepresented minority applicant." *Id.* The Department's 15-point penalty based on national heritage creates the same problem in reverse. It is unconstitutionally decisive because it lowers a native speaker's maximum score to 91 out of 106, which is below the award range for the Doctoral Fellowship. See ECF 24-6 at 2 (refusing to upwardly adjust scores of 82

and 84 to remedy an "oversight" because the applicant was "not within the funding or alternate status range with or without the adjusted score").

Additionally, for a policy to pass narrow-tailoring analysis, the Department must show "serious, good faith consideration of workable [nationality]-neutral alternatives," *Grutter*, 539 U.S. at 339, and the Court may not uphold a nationality-conscious policy unless it is "satisf[ied] that no workable [nationality]-neutral alternative" would achieve the compelling interest, *Fisher*, 570 U.S. at 312. Nothing in the 1998 Final Rule suggests that the Department considered nationality-neutral methods of achieving its asserted goal of promoting foreign-language acquisition in U.S. schools.

The Department did not consider non-discriminatory methods for the simple reason that discrimination was its intended purpose. One way to conduct narrow-tailoring analysis is to ask whether a policy is either overbroad or underinclusive in its use of suspect classifications. *Gratz*, 539 U.S. at 273-75 . An underinclusive policy suggests a disingenuous asserted purpose being used as a pretext for unconstitutional action. *Republican Party of Minn. v. White*, 536 U.S. 765, 779-80 (2002). In *White*, the Court found a statute that prohibited judicial candidates from expressing views—but allowed such expression before declaring candidacy or after being elected—was so underinclusive of the stated purpose of advancing judicial open-mindedness "as to render belief in that purpose a challenge to the credulous." *Ibid*. Here, the Department claims to have imposed the native-language penalty to prioritize students who acquired foreign languages in U.S. schools. 63 Fed. Reg. at 46,359. But national heritage is merely one of many ways a person could acquire a foreign language outside of U.S. schools. Individuals could also acquire foreign languages through, for example, private tutors, traveling overseas, or attending a school outside of the United States. Yet, the Department does not penalize students who acquire foreign languages through these other methods and instead exclusively targets students it perceives to be "non-native born," even if such students are, like Ms. Gonzalez,

born in the United States to immigrant parents. *See id.* at 46,359. Such a "woefully underinclusive" policy raises questions about the Department's true motive. *White*, 536 U.S. at 780.

When a commenter suggested the Department should support high-end expertise in foreign languages regardless of the method of acquisition, the Department responded that "a student conducting research in his or her native language should not enjoy the advantage in the competition that the [previous nationality-neutral] regulations provide." *See* 63 Fed. Reg at 46,360. In other words, the native-language penalty has nothing to do with promoting language acquisition in U.S. schools, as compared to other methods. Rather, the Department believes students whom it perceives to be "non-native born" have an advantage based on their national heritage—*i.e.*, having a foreign native language—and imposed a decisive penalty specifically to offset that perceived advantage. That is textbook invidious discrimination that violates Ms. Gonzalez's constitutional right to equal protection.

### B.  The Department Misinterpreted Its Statutory Authorization to Justify the Native-Language Penalty

Even if the native-language penalty's asserted purpose of promoting foreign-language acquisition in U.S. schools were not pretext for the Department's unconstitutional motive, the penalty would still be unlawful because it is not authorized under the Fulbright-Hays Act.

"[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Department introduced the native-language penalty based on its assertion that "[t]he purpose of the Doctoral Dissertation Research Abroad Fellowship Program (DDRA) is primarily to support students conducting research overseas in non-native languages other than English." 63 Fed Reg. at 46,360. But nothing in the authorizing statute distinguishes between native and non-native languages. Rather, the Doctoral Fellowship is established under 22 U.S.C. § 2452(b)(6), which authorizes the Department to

> promot[e] modern foreign language training and area studies in United States schools,
> colleges, and universities by supporting visits and study in foreign countries by teachers
> and prospective teachers in such schools, colleges, and universities for the purpose of

improving their skill in languages and their knowledge of the culture of the people of those countries.

The Department's 1998 Final Rule reinterpreted Congress's instruction to promote "foreign language training" to mean promote training in "non-native languages other than English." 63 Fed. Reg. at 46,360. This interpretation improperly supplants the plain-meaning definition of "foreign language" as any language not indigenous to a country (here, United States) with any language not derived from an individual's national heritage. The Court must not defer to and should instead reject this misinterpretation, which appears to be based on the Department's conflating the concepts of foreign-language training with foreign-language acquisition. The native-language penalty based on the Department's misinterpretation is not only unauthorized, but it actively undermines Congress's instruction for the Department to use the Doctoral Fellowship to "promot[e] modern foreign language training and area studies" for "teachers and prospective teachers" in U.S. schools. 22 U.S.C. § 2452(b)(6). The Court should therefore enjoin the native-language penalty based on the Department's misinterpretation of "foreign language training."

1. *The Department's Interpretation of 'Foreign Language Training' Is Inconsistent with the Text and Purpose of the Fulbright-Hays Act*

The native-language penalty rests on the Department's 1998 reinterpretation of its authorization in 22 U.S.C. § 2452(b)(6) to support "foreign language training" to mean supporting training only "in non-native languages other than English." 63 Fed Reg. at 46,360. Under this view, Ms. Gonzalez's native language of Spanish is not a "foreign language" within the meaning of § 2452(b)(6). But that atextual interpretation is wholly inconsistent with the text and purpose of the Fulbright-Hays Act and must be rejected.

Statutory interpretation begins (and often ends) with the ordinary meaning of the text. "It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571

U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)); *see also Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) ("As usual, our job is to interpret the words consistent with their ordinary meaning." (cleaned up)). The ordinary meaning of "foreign" is being "characteristic of some place or country other than the one under consideration."[8] A "foreign language" is therefore a language that is not indigenous to the country in question. For the United States, that means any non-English language.

Whether a language is "foreign" must be answered by referencing a specific country, not the national origin of the speaker. For example, when one hears Swedish tourists in the United States speaking their country's language, it is commonly understood that the tourists are speaking a foreign language because Swedish is not indigenous to the United States. The Department's interpretation turns this commonsense understanding on its head and would conclude that Swedish is not a foreign language in the United States if spoken by Swedes. Nothing in the text of the Fulbright-Hays Act of 1961 suggests Congress intended to adopt such an "idiosyncratic definition" of foreign language. *Wis. Cent.*, 138 S. Ct. at 2073. To the contrary, a country-centric rather than individual-centric concept of foreign language is reinforced by the Act's purpose "to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange." 22 U.S.C. § 2451. Such mutual understanding is promoted by improving the training in U.S. schools of languages that are spoken by "people of other countries" and are not spoken by "the people of the United States." Again, that means non-English modern languages, which obviously includes Ms. Gonzalez's native language of Spanish.

Other federal agencies that support foreign-language training notably do not define "foreign language" based on an individual speaker's national origin but rather base it on whether the language

---

[8] *Foreign*, Merriam-Webster, https://www.merriam-webster.com/dictionary/foreign (last visited Dec. 15, 2022).

is indigenous to the United States. The Boren Fellowship administered by the Defense Department, for instance, is authorized to support overseas study of "foreign languages, area studies, counterproliferation studies, and other international fields relating to the national security interests of the United States." 50 U.S.C. § 1902(a)(1)(B)(i). The Defense Department adopts the ordinary meaning of foreign language based on the country in which the language is indigenous,[9] and it celebrates rather than discourages immigrants and children of immigrants who seek to study the foreign language of their national heritage.[10] ECF 24 ¶¶ 55-57. The same is true of the State Department's Critical Language Scholarship. *Id.* ¶¶ 58-60.

In short, the Department's definition of "foreign language training" under the Doctoral Fellowship's authorizing statute to mean only training in "non-native" languages is inconsistent with the plain meaning of the text, the statutory purpose, and how other agencies interpret the same concept. The Court must not defer to the Department's tortured interpretation because "the terms of the congressional delegation [in § 2452(b)(6)] give no indication that Congress meant to delegate authority" to the Department to define the meaning of "foreign language." *United States v. Mead Corp.*, 533 U.S. 218, 231 (2001). Moreover, the concept of foreign language has an easily understood plain meaning. "If uncertainty does not exist, there is no plausible reason for deference." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Rather, the Court must reject the Department's unsupported interpretation, and the native-language penalty based on it.

---

[9] *E.g., Campus Representatives: Roles & Resources,* Boren Awards https://www.borenawards.org/campus-representatives (last visited Dec. 15, 2022) (noting that "Boren Awards give preference to applicants who plan to study languages indigenous to preferred African countries").

[10] The Boren Program boasts that "alumni come from diverse ethnic and socioeconomic backgrounds, including … heritage language speakers and naturalized U.S. citizens." *Ibid.*

>    2.   *The Department's Interpretation of Foreign Language Training Is Based on Its Mistaken*
>         *Belief that Individuals Cannot Be Trained in U.S. Schools in Their Native Language*

The Department followed the plain meaning of "foreign language training" as training in any language not indigenous to the United States for nearly four decades. The 1998 Final Rule, however, adopted a new definition of foreign language, which required the Department to explicitly consider an applicant's national origin. *See* 63 Fed Reg. at 46,360. No statutory text supports this new definition. Instead, the Department offered the following illogical explanation: "Since [Fulbright-Hays] programs were originally intended to enhance the foreign language competence of individuals *trained* in American schools, the [evaluation] criteria are modified to give greater emphasis to having *acquired* a foreign language." *Id.* at 46,359 (emphases added).

The Department uses "acquired" as a term of art to refer to exposure and initial learning of a language in a U.S. school. Native speakers who acquire a foreign language through their national heritage, as opposed to a school, do not "acquire" the language within the Department's meaning of the term. *Id.* at 46,359 (characterizing native-language penalty as placing "emphasis in the selection criteria on the use of an acquired (*i.e.*, non-native) foreign language"). This unexplained fixation on language acquisition in U.S. schools appears to be based on a misreading of § 2452(b)(6)'s instruction for the Doctoral Fellowship to "promot[e] modern foreign language training … in United States schools." The Department apparently believes that, because native speakers acquire their foreign language through their national heritage rather than American schools, they somehow cannot be subsequently "trained in American schools" and thus do not fall within the statute's instruction to promote training in U.S. schools. 63 Fed. Reg. at 46,359. That view is clearly wrong because U.S. students who acquire a foreign language from their national heritage can—and many do—receive training in U.S. schools in their native language.

Foreign-language acquisition, as the Department defines it, is different from foreign-language training that Congress instructed the Department to promote. Whereas acquisition occurs once, training is the continual process of improving one's proficiency in a language that one has already acquired. Importantly, acquiring a language from one's national heritage presents no barrier to subsequently being trained in American schools in that same language. U.S. students who speak English as their native language, for example, do not acquire English from school. Yet, they obviously receive English-language training in American schools. A U.S. student who speaks a foreign language as their native language can likewise receive training in that language from an American school.

Indeed, Ms. Gonzalez received significant training in her native language of Spanish in U.S. schools, including AP Spanish high school classes and various coursework and programs during higher education. *See* ECF 24 ¶ 84; Gonzalez Decl. ¶¶ 5-6. She and countless Americans like her stand as living, breathing examples of the Department's error. No matter how many courses these immigrants and children of immigrants take in American schools to improve proficiency or acquire discipline-specific usage and vocabulary in the language of their national heritage, the Department refuses to see them as "individuals trained in American schools" whom the Doctoral Fellowship is designed to support. 63 Fed. Reg. at 46,359. Such a nonsensical—and frankly offensive—position cannot support limiting the "foreign language training" the Department is required to promote under § 2452(b)(6) to mean training in an applicant's non-native languages.

> 3. *The Native-Language Penalty Undermines Modern Foreign Language Training and Area Studies of Teachers and Prospective Teachers in U.S. Schools*

The Department's fixation with foreign language acquisition as opposed to training is especially indefensible in the context of the Doctoral Fellowship, which requires dissertation research in a foreign language and therefore a high level of proficiency. Mere acquisition (*i.e.*, exposure and initial learning) of a foreign language at a U.S. school—the promotion of which is the proffered

purpose of the Department's native-language penalty—obviously would not allow a student to conduct doctoral-level research in that language. Rather, what matters is that recipients have advanced language skills. Immigrants and children of immigrants who receive foreign-language training in American schools, such as Ms. Gonzalez, are an obvious pool of qualified candidates. The Department's use of the native-language penalty to disqualify such individuals trained in American schools from receiving support from the Doctoral Fellowship is patently inconsistent with Congress's explicit instruction for the Department to establish the Doctoral Fellowship to promote their training.

What's more, the native-language penalty discourages individuals who acquired a foreign language through their national heritage from pursuing additional training in that language at U.S. schools. A child of immigrants like Ms. Gonzalez who acquires a foreign language through her national heritage and then pursues foreign-language training at a U.S. doctoral program to achieve a high level of fluency in that language will be deemed a "native speaker" who will receive 0 out of 15 points under the native-language penalty. ECF 24-1 at PageID# 10. But if the same student avoids training, he or she will be classified as a less-fluent "heritage speaker" who is entitled to up to 10 out of 15 points. *Ibid.* In other words, the regulation actively discourages immigrants and children of immigrants from pursuing additional training in their native language. This is, of course, the opposite of Congress's instruction to "promot[e] modern foreign language training … in United States schools[.]" 22 U.S.C. § 2452(b)(6).

The native-language penalty also contradicts Congress's instruction for the Department to administer the Doctoral Fellowship to "promot[e] … area studies in United States schools[.] *Ibid.* According to the Department, "excluding … the applicant's native language [from being eligible for points] … would encourage non-native born United States citizens or resident aliens to acquire an additional foreign language." 63 Fed. Reg. at 46,359. Not so. Acquiring additional foreign languages from U.S. schools cannot change Ms. Gonzalez's Mexican national heritage, which is the basis of the

penalty. Even if she acquired ten additional foreign languages, Ms. Gonzalez would still be subject to an insurmountable 15-point penalty if she applies to use the Doctoral Fellowship to conduct dissertation research in any Spanish-speaking country, from Spain to Chile. The only way for Ms. Gonzalez to avoid the penalty is to apply to study in a non-Spanish-speaking country. Thus, to the extent the native-language penalty "encourage[s] non-native born United States citizens or resident aliens," it encourages them to not pursue dissertation research in any area of the world that speaks their native language. Such discouragement is anathema to Congress's instruction for the Department to establish a Doctoral Fellowship that "promot[es] … area studies in United States schools[,]" and therefore is not authorized by the Fulbright-Hays Act.

Finally, the native language penalty violates Congress's authorization in 22 U.S.C. § 2452(b)(6) to promote the training of only "teachers and prospective teachers" by "supporting [their] visits and study in foreign countries." *Ibid.* These "teachers and prospective teachers" would "improv[e] their skill in languages and their knowledge of the culture of the people of those countries" and then return to train new generations of U.S. students. To the extent the native-language penalty promotes any foreign-language training, it does so in an entirely unauthorized way: by encouraging students to acquire—*i.e.*, learn for the first time—foreign languages in a school setting, as opposed to through their national heritage. 63 Fed. Reg. at 46,359.

The individuals whose foreign-language acquisition (meaning initial learning) the native-language penalty purports to promote, by definition, have not yet acquired the language in question. They have no concrete plans to study abroad in a country that speaks that language, let alone use that language to teach in U.S. schools, as Congress intended in 22 U.S.C. § 2452(b)(6). Put simply, Congress tasked the Department to promote the foreign-language training of "teachers and prospective teachers," and the Department issued a regulation to promote the training of novices. While

introducing novices to new languages may be a valuable policy goal, it is not one Congress authorized the Department to pursue using programs established under § 2452(b)(6).

At bottom, the native-language penalty rests upon the Department's untenable interpretation of "foreign language training" in § 2452(b)(6) to mean training of an individual's non-native language. That interpretation ignores the plain meaning of statutory text and is based on the Department's indefensible belief that immigrants and their children are incapable of receiving training in their native language from U.S. schools because they have already "acquired" that language from family. This erroneous interpretation, and the native-language penalty it spawned, actively undermines § 2452(b)(6)'s requirement for the Department to administer the Doctoral Fellowship to promote foreign-language training and area studies of teachers and prospective teachers in U.S. schools. Thus, even if the Department's native-language penalty somehow survives strict scrutiny, the Court must still enjoin it for violating the Doctoral Fellowship's authorizing statute.

## II. Ms. GONZALEZ WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable. The plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986) (footnotes omitted). Here, Ms. Gonzalez faces two types of irreparable injury.

First, the denial of the Doctoral Fellowship in 2022 threatens to inflict irreparable injury by preventing Ms. Gonzalez from completing her doctoral program within UC Irvine's seven-year deadline. Graduate School Handbook at 8. "Students who fail to advance prior to program deadlines are not considered in good standing," and "[f]ailure to complete all degree requirements by the end of the seventh year may result in initiation of steps to terminate the student's status as a doctoral student." *Id.* at 8, 24. Because Ms. Gonzalez started her doctoral program in 2017, she must defend her

dissertation by summer 2024 to meet UC Irvine's seven-year deadline. Gonzalez Decl. ¶ 9. To do so, she must conduct a one-year course of dissertation research in Mexico, for which she sought funding through the Doctoral Fellowship. *Id.* ¶ 10. If Ms. Gonzalez does not receive the Fellowship in spring 2023, she will be unable to complete her research in time for the summer 2024 deadline. She would fall out of good standing, lose eligibility for internal funding, and be in jeopardy of being dismissed. Delaying award of the Doctoral Fellowship past spring 2023 therefore threatens to inflict irreparable harm, and an injunction requiring Defendants to immediately reevaluate Ms. Gonzalez's application and to award her the Fellowship if her new score is sufficient is needed to prevent such irreparable harm.

Second, because the Department's rulemaking effort to revise its language-proficiency evaluation criterion will not be complete for the 2023 application cycle, Ms. Gonzalez's 2023 application will be subject to the same unconstitutional evaluation process as in 2022. Constitutional violations "for even minimal periods of time … unquestionably constitutes irreparable injury." *BST Holdings LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). That "includes violation of rights under the Equal Protection Clause." *Arnold v. Barbers Hill Indep. Sch. Dist.*, 479 F. Supp. 3d 511, 529 (S.D. Tex. 2020) (citing *Killebrew v. City of Greenwood*, 988 F. Supp. 1014, 1016 (N.D. Miss. 1997)). Merely being subject to a facially discriminatory evaluation process is sufficient to establish a constitutional harm, regardless of whether the plaintiff would have received the benefit in the absence of the discrimination. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.").

The court in *Killebrew* issued a preliminary injunction based, in part, on its finding that a "promotional system [that] is based upon race and not solely upon merit" poses "a substantial threat

of irreparable injury." 988 F. Supp. at 1016. The Department's evaluation scheme for language proficiency is even worse because it is not even partially based upon merit. In 2022, the Department's evaluation of Ms. Gonzalez's foreign-language proficiency was not based at all upon her actual proficiency in the relevant language and was instead based solely upon her Mexican heritage. The same penalty will be assessed against her 2023 application, in violation of her constitutional right to equal protection. That discriminatory treatment constitutes textbook irreparable injury because "'[d]ollars and cents' cannot capture the damage that the government inflicts when it deprives rights that it exists to defend." *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *16 (5th Cir. Feb. 17, 2022) (Smith, J., dissenting) (quoting *BST Holdings*, 17 F.4th at 618). To prevent this harm, the Court should issue an injunction requiring the Department to suspend the native-language penalty when it announces the 2023 application cycle in the Federal Register.

### III. HARM TO MS. GONZALEZ OUTWEIGHS ANY INCONVENIENCE TO THE DEPARTMENT

The irreparable injury that Ms. Gonzalez will suffer without a preliminary injunction outweighs any inconvenience to the Department. On one hand, Ms. Gonzalez is threatened with loss of good standing, loss of internal funding, and potential dismissal from her doctoral program. On the other, all that is requested of the Department is to reevaluate Ms. Gonzalez's application without considering her national heritage. Her scores for each evaluation category other than foreign language need not be reconsidered. The Department thus needs only to reevaluate her Spanish proficiency—which should be simple given her native-level fluency—and recalculate her total score.

Nor is it burdensome to require the Department to suspend 34 C.F.R. § 662.21(c)(3) for the 2023 application cycle because it is already in the process of revising that regulation. All that is requested is for the Department to evaluate Ms. Gonzalez's 2023 application without considering her national heritage. Even assuming this minimal intrusion constitutes some sort of burden, the

deprivation of Gonzalez's constitutional right to equal protection vastly outweighs any inconvenience to the Department.

## IV. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST

Where, as here, the government is the opposing party, Plaintiffs' likelihood of success on the merits is a strong indicator that a preliminary injunction serves the public interest because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Wages and White Lion Invs. LLC v. FDA*, 16 F.4th 1130, 1143 (2021). Reversing the Department's denial of Gonzalez's application based on her Mexican national heritage serves the public interest because "it is always in the public interest to prevent the violation of a party's constitutional rights." *G&V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994).

The public also has an interest in having the most qualified applicants receive Doctoral Fellowships unimpeded by invidious discrimination. *Killebrew*, 988 F. Supp. at 1016 ("The public deserves to have the most qualified fire fighters advance through the ranks of the city's fire department unimpeded by race-based promotional policies."). Applicants with the best qualifications would learn more and become better teachers to future generations of U.S. students, thus furthering 22 U.S.C. § 2452(b)(6)'s mandate to "promot[e] modern foreign language training and area studies in United States schools, colleges, and universities." The Department' reviewers recognized that Ms. Gonzalez's proficiency in Spanish is an asset for conducting research in Mexico. But the native-language penalty forced them to give her zero points for language proficiency in Spanish. Continuing to deny Ms. Gonzalez the Fellowship for having desirable qualifications—native-level fluency in Spanish—for no reason other than her national heritage gravely disserves the public interest.

## CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court grant this Motion for Preliminary Injunction before March 1, 2023, to require Defendants to re-evaluate Ms. Gonzalez's

application and award her the Doctoral Fellowship if her new score qualifies her for funding. The Court should also enjoin the Department from applying 34 C.F.R. § 662.21(c)(3) for the 2023 application cycle (and thereafter until the Department amends its rule to eliminate discrimination based on national origin), so that no 2023 applicants are subject to the unconstitutional evaluation criterion that beset review of Ms. Gonzalez's 2022 application.

January 3, 2023

Respectfully submitted,

/s/ Sheng Li

Sheng Li, Pro Hac Vice
John J. Vecchione, Pro Hac Vice
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
Sheng.Li@ncla.legal
John.Vecchione@ncla.legal

/s/ Cory R. Liu

Cory R. Liu, TX Bar No. 24098003
ASHCROFT SUTTON REYES LLC
919 Congress Ave, Suite 1325
Austin, TX 78701
(512) 370-1800
cliu@ashcroftlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2023, an electronic copy of the foregoing was filed electronically via the Court's ECF system, which effects service upon counsel of record.

/s/ Sheng Li