**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| **EDGAR ULLOA LUJAN, SAMAR**<br>**AHMAD and VERONICA GONZALEZ,**<br><br>        ***Plaintiffs*,**<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF**<br>**EDUCATION, MIGUEL CARDONA,** *in*<br>*his official capacity as Secretary of the U.S.*<br>*Department of Education*, **and NASSER H.**<br>**PAYDAR,** *in his official capacity as*<br>*Assistant Secretary of Postsecondary*<br>*Education of the U.S. Department of*<br>*Education*,<br><br>        ***Defendants*.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§        **3:22-CV-00159-DCG** |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Edgar Ulloa Lujan, Samar Ahmad, and Veronica Gonzalez—three doctoral

students—have sued the U.S. Department of Education ("Department") and its Secretary and the

Assistant Secretary of Postsecondary Education, Miguel Cardona and Dr. Nasser H. Paydar,

respectively.[1] *See generally* Am. Compl., ECF No. 24. The Department administers the

Fulbright-Hays Doctoral Dissertation Research Abroad Fellowship ("Fulbright-Hays

---

[1] Plaintiffs sued Secretary Cardona and Assistant Secretary Paydar in their official capacities.
Am. Compl., ECF No. 24 ¶¶ 5–6. Also, when Plaintiffs filed their lawsuit, they named Michelle Asha
Cooper, the former Acting Assistant Secretary of the U.S. Department of Education for Postsecondary
Education. *Id.* ¶ 6. The U.S. Department of Education's website shows that Dr. Nasser H. Paydar is now
serving as the Assistant Secretary for Postsecondary Education. *See* U.S. Dep't Educ., Office of the
Assistant Secretary for Postsecondary Education (last visited Mar. 20, 2023), *available at* https://www2.e
d.gov/about/offices/list/ope/oas.html. Under Federal Rule of Civil Procedure 20(d), Dr. Nasser H. Paydar
is automatically substituted as the proper defendant. Fed. R. Civ. P. 20(d) ("An action does not abate
when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office
while the action is pending. The officer's successor is automatically substituted as a party.").

Fellowship"), for which each Plaintiff applied.  During the 2022 application cycle, the Department did not award a fellowship to any of the Plaintiffs.

Plaintiffs contend one of the criteria the Department uses to assess applicants—the foreign language proficiency criterion ("Foreign-Language Criterion")—is unlawful.  The Department uses the Foreign-Language Criterion to assess an applicant's proficiency in a foreign language of the country the applicant intends to study in.  When reviewers assess applications, they award points to each evaluation criteria.  Crucially, the Department does not award applicants any points for proficiency in their native language(s).  Plaintiffs are each natively fluent in a language other than English, so according to the Department's regulation governing the assessment of foreign language proficiency, each received zero points for foreign language proficiency.

One Plaintiff—Veronica Gonzalez—has moved for a preliminary injunction against Defendants.  Mot., ECF No. 25.  Gonzalez presses two theories: first, the Department acted outside its statutory authority in issuing the Foreign-Language Criterion and, second, the Foreign-Language Criterion violates the Fifth Amendment of the United States Constitution's due process and equal protection guarantees.[2]  *Id.* at 16–31.[3]  Agreeing that the Department likely acted outside its statutory authority, and that Gonzalez has otherwise shown she is entitled

---

[2] Collectively, Plaintiffs assert several theories, not all of which the Court addresses in this opinion and order.  Plaintiffs claim that (1) the Department acted outside of its statutory authority in issuing the Foreign-Language Criterion; (2) the Foreign-Language Criterion violates the Fifth Amendment of the United States Constitution's due process and equal protection guarantees; and (3) the Foreign-Language Criterion violates Title VI of the 1964 Civil Rights Act.  Am Compl. ¶¶ 117–27, 128–37, 138–44.  Plaintiffs Ahmad and Lujan also claim that the Department acted arbitrarily and capriciously when it denied their applications for the Fulbright-Hays Fellowship.  *Id.* ¶¶ 145–52.  This opinion and order does not address any of Plaintiffs Ahmad and Lujan's claims or the Title VI claim.

[3] Citations to page numbers in this Opinion refer to the pagination assigned by the Court's CM/ECF System, not the documents' internal pagination.

to preliminary relief, the Court **GRANTS IN PART** Gonzalez's Motion and **VACATES** the

Foreign-Language Criterion.  The Court does not address Gonzalez's constitutional claim.

## I.    BACKGROUND

### A.  Statutory and Regulatory Background

The Fulbright-Hays Fellowship has its roots in the Mutual Educational and Cultural

Exchange Act, also called the Fulbright-Hays Act, which Congress passed in 1961.  In the Act,

Congress authorized the President

> to provide for . . . promoting modern foreign language training and area studies in
> United States schools, colleges, and universities by supporting visits and study in
> foreign countries by teachers and prospective teachers . . . for the purpose of
> improving their skill in languages and their knowledge of the culture of the people
> of those countries . . . .

22 U.S.C. § 2452(b)(6).  Congress, in turn, allowed the President to "delegate, to any such

officers of the Government as he determines to be appropriate, any of the powers [Congress]

conferred upon him" in the Act.  *Id.* § 2454(a).  In 1962, President John F. Kennedy did just that.

He delegated his authority under section 2452(b)(6) to the Department's predecessor,[4] the

Department of Health, Education, and Welfare.  Exec. Order No. 11,034, 27 Fed. Reg. 6071,

6072 (1962).

The Department then issued regulations establishing and governing the Fulbright-Hays

Fellowship.  *See* 34 C.F.R. Part 662.  The Fulbright-Hays Fellowship "is designed to contribute

to the development and improvement of the study of modern foreign languages and area studies

---

[4] Though Congress delegated section 2452(b)(6) authority to the President, for clarity, throughout
the opinion the Court will sometimes refer to the Department instead.  Reference to the Department may
also be a reference to the Department of Health, Education, and Welfare, which initially promulgated the
relevant regulations.  *See, e.g.*, 39 Fed. Reg. 43,389, 43,415–16 (1974).

in the United States by providing opportunities for scholars to conduct research abroad."[5]  *Id.*
§ 662.1.  The Department awards Fulbright-Hays Fellowships to U.S. citizens or permanent
residents who are graduate students "planning a teaching career in the United States" and
"[p]ossess[] sufficient foreign language skills" to carry out their proposed dissertation project.
*Id.* § 662.3.  Reviewers assess applications for the Fulbright-Hays Fellowship on a number of
metrics, including the Foreign-Language Criterion:

> The applicant's proficiency in one or more of the language (other than English and
> the applicant's native language) of the country or countries of research, and the
> specific measures to be taken to overcome any anticipated language barriers.

*Id.* § 662.21(c)(3).

The current Foreign-Language Criterion dates back to 1998.  34 C.F.R. Part 662, 63 Fed.
Reg. 46,358, 46,361–63 (1998).  Before then, the Department evaluated whether "[t]he applicant
possesse[d] adequate foreign language skills to carry out the proposed project."  34 C.F.R.
§ 662.32(b)(2)(ii) (1997).  So, in 1998, the Department narrowed the scope of Foreign-Language
Criterion by adding a requirement that applicants be proficient in a language "other than English
and the applicant's native language."  34 C.F.R. § 662.21(c)(3) (1998).

The Department justified its change to the Foreign-Language Criterion by concluding the
Fulbright-Hays Fellowship is really about foreign language *training*.  *See* 63 Fed. Reg. 46,358,
46,359 (1998).  To the Department, foreign language training is fundamentally about the
*acquisition* of a new language—that is, a non-native language—not about a person's study and
improvement in any language she might already know.  *See id.*  In the Department's own words:

> Since the programs were originally intended to enhance the foreign language
> competence of individuals trained in American schools, the criteria are modified to
> give greater emphasis to having acquired a foreign language.  Paragraph (c)(3) adds

---

[5] The Department defines "area studies" as "a program of comprehensive study of the aspects of a
society or societies, including the study of their geography, history, culture, economy, politics,
international relations, and languages."  34 C.F.R. § 662.7(c).

the requirement that the applicant be proficient in one or more of the languages of the country or countries of research, excluding English and the applicant's native language.  The language mostly likely would result in a decrease in the number of applicants from individuals wishing to conduct research in English and would encourage non-native born United States citizens or resident aliens to acquire an additional foreign language.  The Department has experienced a substantial increase in the number of applications for conducting research in English.

*Id.*

During the notice-and-comment rulemaking, one commenter "was troubled by the Department's emphasis in the selection criteria on . . . an acquired (i.e., non-native) foreign language." *Id.* at 46,360.  The commenter understood the Fulbright-Hays Act to authorize foreign language exchange programs that "support [] the development of high-end expertise in languages other than English regardless of the method of acquisition." *Id.*  But the Department's overriding concern was based on a "belie[f] that a student conducting research in his or her native language should not enjoy the advantage in the competition that the [previous] regulations provide[d]."[6] *Id.*  Thus, the Department kept the proposed Foreign-Language Criterion—the language Gonzalez challenges here.

## B.  Factual Background

Gonzalez is a doctoral student at the University of California Irvine's Department of Social Ecology.[7]  She was born in Santa Maria, CA to parents who immigrated from Mexico.[8]

---

[6] The Department also wanted "to preserve the program as a vehicle for overseas research by students who have completed the non-native language training under the Department's Title VI Foreign Language and Area Studies (FLAS) Fellowship program."  63 Fed. Reg. 46,358, 46,359 (1998).

[7] Am. Compl. ¶ 85; Gonzalez Decl., Mot. Ex. 2, ECF No. 25-2 ¶ 6.

[8] Am. Compl. ¶ 83; Gonzalez Decl. ¶ 2.

Spanish is her native language; she grew up speaking it at home and learned English in primary school.[9]

Although she learned Spanish at home, Gonzalez pursued formal Spanish-language instruction. In high school, she took two years of Advanced Placement ("AP") Spanish.[10] Continuing her training in college, Gonzalez participated in a research program at University of Southern California that "involved traveling to Mexico to take courses taught in Spanish."[11] And during her doctoral program, she has "participated in the Chicano Latino Emphasis Program" at UC Irvine, which includes Spanish-language courses.[12]

Gonzalez is almost done with her doctoral studies. But to defend her dissertation on intimate partner violence in Mexico,[13] she needs to conduct one year of research in Mexico.[14] Last year, in April 2022, she sought funding for her Mexico-based dissertation research through the Fulbright-Hays Fellowship program.[15] The Department did not award her a Fulbright-Hays Fellowship.[16] Gonzalez alleges that the Department rejected her application because, under the Foreign-Language Criterion, she received no credit for her Spanish-language skills.[17]

---

[9] Am. Compl. ¶ 83; Gonzalez Decl. ¶ 3.

[10] Am. Compl. ¶ 84; Gonzalez Decl. ¶ 5.

[11] Gonzalez Decl. ¶ 6; Am. Compl. ¶ 86.

[12] Gonzalez Decl. ¶ 6; Am. Compl. ¶ 86.

[13] *See* Technical Review Sheet No. 1, Am. Compl. Ex. 12, ECF No. 24-12, at 3; Technical Review Sheet No. 2, Am. Compl. Ex. 13, ECF No. 24-13, at 3.

[14] *See* Gonzalez Decl. ¶ 10–11.

[15] Gonzalez Decl. ¶ 7; Am. Compl. ¶ 87.

[16] *See* Gonzalez Decl. ¶ 11; Explanation Letter, Am. Compl. Ex. 14, ECF No. 24-14.

[17] *E.g.*, Am. Compl. ¶¶ 88–96.

To understand her allegation, we look at the application review process. Two anonymous reviewers assess each application.[18] Reviewers assess applications on a number of metrics, which can be divided into two groups: quality of the proposed project and qualifications of the applicant.[19] The Department assigns each metric a total possible point value. For example, during the 2022 application cycle, an applicant could receive up to 15 points for the quality of their hypothesis and proposed research methods.[20] Now, the heart of this case. During the 2022 application cycle, an applicant could also receive up to 15 points for their "proficiency in one or more of the languages (*other than* English and *the applicant's native language*) of the country or countries of research."[21] Applicants, like Gonzalez, who identified themselves as native speakers of a foreign language received zero points.[22]

So despite receiving near perfect scores on each metric—with the glaring exception of foreign language proficiency—Gonzalez fell below the score necessary to receive a Fulbright-Hays Fellowship in 2022.[23] Gonzalez plans to re-apply for a 2023 Fulbright-Hays Fellowship.[24]

---

[18] *Id.* ¶ 88.

[19] 34 C.F.R. § 662.21(b)–(c).

[20] *See id.* § 662.21(b)(1); Technical Review Sheet No. 1 at 3.

[21] 34 C.F.R. § 662.21(c)(3) (emphasis added); Technical Review Sheet No. 1 at 6; Technical Review Sheet No. 2 at 6.

[22] Technical Review Sheet No. 1 at 6 ("The applicant is a native speaker of Spanish and therefore does not qualify for points in this category."); Technical Review Sheet No. 2 at 6; Explanation Letter.

[23] *See, e.g.*, Am. Compl. ¶¶ 89–97; Technical Review Sheet No. 1 at 3–8; Technical Review Sheet No. 2 at 3–8.

[24] Gonzalez Decl. ¶ 11.

## C. The Department's Anticipated Rulemaking and Recent Changes

In response to Plaintiffs' lawsuit, the Department began the process of reviewing and possibly amending the Foreign-Language Criterion.[25]  The Department's draft notice of proposed rulemaking recently cleared review by the Office of Information and Regulatory Affairs in the Office of Management and Budget.[26]  And the Department has just now published a notice of proposed rulemaking in the Federal Register.[27]  But it is extraordinarily unlikely that the Department will publish a final rule before the 2023 Fulbright-Hays Fellowship application deadline on April 11, 2023.[28]  In fact, the Department does not plan to finish the notice-and-comment rulemaking before Gonzalez needs to submit her 2023 Fulbright-Hays Fellowship application.[29]  What the Department did do, however, was inform applicants that it will assess only one point, instead of 15, to foreign language proficiency for the 2023 application cycle.[30]

---

[25] Resp. at 16–17; Dep't of Educ., Unified Regulatory Agenda, RIN: 1840-AD90 (last visited Mar. 16, 2023), *available at* https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202210&RIN =1840-AD90.

[26] OIRA, *OIRA Conclusion of EO 12866 Regulatory Review*, https://www.reginfo.gov/public/do/e oDetails?rrid=294011 (review concluded on Mar. 10, 2023).

[27] 88 Fed. Reg. 16,924, 16,924–32 (2023).

[28] *See* 88 Fed. Reg. 8832, 8832 (2023).

[29] *See id.* at 8835 (showing that the Department still plans to evaluate applicant's foreign language proficiency under the Foreign-Language Criterion).  The Department is providing the public 30 days to comment on its proposed rule—a period of time that will not elapse before April 11, 2023.  *See* 88 Fed. Reg. 16,924, 16,924–32 (2023) (providing April 20, 2023 as the comment deadline).

[30] *See* 88 Fed. Reg. 8832, 8835 (2023) (shifting 14 points to quality of the proposed project).

## II.   JURISDICTION: MOOTNESS

As one part of her requested relief, Gonzalez asks for an order requiring the Department to reevaluate her 2022 application.[31]  Mot. at 15, 34–35.  The Department says her request for reevaluation is moot because the 2022 appropriation cycle has lapsed and because it has spent the funds Congress appropriated to it for 2022 Fulbright-Hays Fellowships.  Resp. at 18–21.  The Court agrees.

### A.  Mootness and Congressional Appropriations

Federal courts are limited by Article III of the U.S. Constitution to "only deciding live cases or controversies."  *Spell v. Edwards*, 962 F.3d 175, 178–79 (5th Cir. 2020).  Mootness is a jurisdictional doctrine that stops courts from deciding matters that can no longer be characterized as a live dispute.  *See id.* at 179–80.  "A matter is moot 'when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'"  *Id.* at 179 (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012)).  In the context of a plaintiff's request for congressionally appropriated funds, such a dispute may be moot if the "appropriation has lapsed or has been fully obligated."  *See City of Houston v. U.S. Dep't Hous. & Urb. Dev.*, 24 F.3d 1421, 1424 (D.C. Cir. 1994).

When a plaintiff seeks money from a federal agency as a form of relief, two fundamental legal concepts are at play: sovereign immunity and limits on spending congressional appropriations.  The sovereign immunity aspect implicates section 702 of the Administrative Procedure Act ("APA"), which "waives the United States' sovereign immunity for actions seeking non-monetary relief against government agencies."  *Cambranis v. Blinken*, 994 F.3d

---

[31] She also asks that the Court set aside the Department's Foreign-Language Criterion for the 2023 application cycle.  Mot. at 34–35.  The Department does not challenge the Court's jurisdiction over that part of the dispute.  *See* Resp. 18–21.

457, 462 (5th Cir. 2021).  "Non-monetary relief," however, does not equal "no money whatsoever."  Rather, section 702 preserves sovereign immunity over claims for money damages, but waives sovereign immunity for claims to specific relief, even if the specific relief would require the agency to pay money.  *See, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879, 893–94, 900–01 (1988) ("The fact that the mandate is one for the payment of money must not be confused with the question whether such payment . . . is a payment of money as damages or as specific relief.").

The D.C. Circuit has succinctly explained the difference: "[M]oney damages represent compensatory relief, an award given to a plaintiff as a substitute for that which has been lost; specific relief in contrast represents an attempt to restore to the plaintiff that to which it was entitled from the beginning."  *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000).  So, for example, if a plaintiff participates in a grant program administered by an agency, but the agency does not provide the plaintiff grant money, for whatever allegedly unlawful reason, the plaintiff can seek relief in the form of an injunction requiring the agency to pay the plaintiff the grant money she was entitled to under the program.  *See City of Houston*, 24 F.3d at 1425, 1427.  That is specific relief, not compensatory damages.

But the availability and timing of congressional appropriations can limit the possibility of a plaintiff's relief in the form of money owed—sometimes called the "*res*."[32]  Indeed, "in cases challenging an agency's expenditure of funds, the *res* at issue is identified by reference to the congressional appropriation that authorized the agency's challenged expenditure."  *County of Suffolk v. Sebelius*, 605 F.3d 135, 141 (2d Cir. 2010).

---

[32] Funds may be unavailable for several reasons, including a lapse in the appropriation, or because "the funds have already been awarded to other recipients," or because "Congress [has] rescind[ed] the appropriation."  *City of Houston*, 24 F.3d at 1426.

This principle is grounded in separation of powers.  The Appropriations Clause of the U.S. Constitution says that "[n]o money shall be drawn from Treasury, but in Consequence of Appropriations made by Law."  U.S. CONST. art. I, § 9, cl. 7.  Appropriations are Congress's wheelhouse.  A court cannot order an agency to provide specific relief in the form of money when the agency does not have remaining funds for the challenged program or the relevant appropriation cycle has lapsed.  *County of Suffolk*, 605 F.3d at 141; *City of Houston*, 24 F.3d at 1428 ("When the relevant appropriation has lapsed or been fully obligated . . . the federal courts are without authority to provide monetary relief.").  That is because an agency cannot draw money from a pot that Congress has not authorized it to access.

## B.  Gonzalez's 2022 Fulbright-Hays Fellowship Application Claim Is Moot

Recall Gonzalez asks the Court to order the Department "to re-evaluate [her] [2022] application and award her the [Fulbright-Hays] Fellowship if her new score qualifies for funding."  Mot. at 34–35.  The problem is the Department's appropriations for the 2022 application cycle have lapsed and have been fully obligated.  In the Consolidated Appropriations Act of 2022, Congress said that "[n]o part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein."[33] Pub. L. No. 117-103, Title V, § 502, 136 Stat. 49, 144 (2022).  The fiscal year ended on September 30, 2022.[34]  Gonzalez may have been able to preserve her interest in her 2022

---

[33] Congress did not provide an exception when it appropriated funds for the Fulbright-Hays Fellowship.  *See* Pub. L. No. 117-103, 136 Stat. 49, 482–83 (2022).

[34] U.S. Dep't of the Treasury, FiscalData (last visited Mar. 15, 2023), *available at* https://tinyurl.com/Treasury-FiscalData.

application and 2022 funding if she had filed for relief before the end of the fiscal year, *cf. City of Houston*, 24 F.3d at 1426–27, but she did not do so, *see* Mot. at 35 (dated Jan. 3, 2023).[35]

The Department has also fully obligated all of its 2022 Fulbright-Hays Fellowship funds. Resp. at 20; *see also* U.S. Dep't of Educ., *Fulbright-Hays—Doctoral Dissertation Research Abroad: Funding Status* (last visited Mar. 15, 2023), https://www2.ed.gov/programs/iegpsddrap/funding.html (showing fiscal year 2022 funds as fully awarded). The lack of 2022 funds is an independent reason why Gonzalez cannot obtain the relief she seeks. Requiring the Department to award Gonzalez with a Fulbright-Hays Fellowship because of a re-reviewed and successful 2022 application would not be specific relief. Specific relief would be an award of funds appropriated by Congress for the 2022 application cycle. *See County of Suffolk*, 605 F.3d at 141. What Gonzalez requests is money damages, from which the Department is immune, *City of Houston*, 24 F.3d at 1428 ("Section 702 permits monetary awards only when . . . such an award constitutes *specific relief*—that is, when a court orders a defendant to pay a sum owed out of a specific *res*.").

Gonzalez resists that conclusion by arguing she is not seeking 2022 funds. She insists the Department can reevaluate her 2022 application and award her 2023 funds. *See* Mot. at 34–35; Reply at 12. There is a distinction, however, "between original funds and substitute funds . . . in cases involving yearly grant appropriations." *Modoc Lassen Indian Hous. Auth. v. U.S. Dep't Hous. & Urb. Dev.*, 881 F.3d 1181, 1197 (10th Cir. 2017). And that distinction is dispositive. *Id.* (citing *County of Suffolk*, 605 F.3d at 141, and *City of Houston*, 24 F.3d at 1428). The best the Court could do—as Gonzalez suggests—is order the Department to fund her desired 2022

---

[35] In fact, Gonzalez was not a plaintiff in this case until November 16, 2022, when Plaintiffs filed their Amended Complaint—after the end of the fiscal year. *Compare* Am. Compl. ¶¶ 1–6, *with* Compl., ECF No. 1 ¶¶ 1–5.

Fulbright-Hays Fellowship with 2023 funds, but that would be impermissible money damages. *Id.*

*Modoc Lassen* clarifies the Court's conclusion.  There, several Indian tribes ("Tribes") sued the U.S. Department of Housing and Urban Development ("HUD") to recover funds HUD had deducted from yearly grants it provided to the Tribes under a program established by the Native American Housing Assistance and Self-Determination Act ("NAHASDA").  *Id.* at 1186. HUD had been deducting money from the Tribes' NAHASDA grants to recoup funds it alleged it had overpaid to the Tribes in previous years.  *See id.* at 1186, 1192.  The Tribes argued, among other things, that HUD had no authority to deduct the money, and the Tenth Circuit agreed.  *Id.* at 1192–95.  But the Tenth Circuit also concluded that despite HUD's unlawful actions, the Tribes could not get relief because any award would be money damages.  *See id.* at 1195–98. Accordingly, the Tenth Circuit reversed the district court's order requiring HUD to reimburse the Tribes from future NAHASDA appropriations.  *See id.* at 1196–97.

The same is true here.  Any relief the Court could provide Gonzalez relative to her 2022 Fulbright-Hays Fellowship application would require the Department to draw on funds outside the 2022 appropriation.  But "[a]n award of monetary relief from any source of funds other than [the relevant year] would constitute money damages rather than specific relief, and so would not be authorized by APA section 702."  *City of Houston*, 24 F.3d at 1428.  Thus, Gonzalez is unlikely to succeed on her claim for relief relative to her 2022 application.  As in *City of Houston*, Gonzalez's claims related to her 2022 Fulbright-Hays Fellowship application are likely moot.[36]

---

[36] Gonzalez also tries to save her 2022 application by arguing she is seeking "the *specific relief* to which [she] is entitled"—that is, Fulbright-Hays Fellowship money generally.  *See* Reply at 11–12 (emphasis added).  It's true that after *City of Houston* the D.C. Circuit clarified that "[w]here a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief,

## III.   DISCUSSION

The Department implicitly concedes that the parties' dispute over the preliminary relief
Gonzalez seeks as to her prospective 2023 Fulbright-Hays Fellowship application remains live.
*Compare* Gonzalez Decl. ¶ 11 ("I plan to re-apply when the 2023 application cycle opens."),
*with* Notice 2023 Application Cycle, 88 Fed. Reg. 8832, 8832–37 (2023) (2023 application cycle
is open), *and generally* Resp.

### A.  Preliminary Injunction Standard

Preliminary injunctions are "extraordinary remed[ies]" and are "never awarded as of
right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To obtain a preliminary
injunction, a plaintiff must show:

> (1) that she is likely to succeed on the merits;
>
> (2) that she is likely to suffer irreparable harm in the absence of preliminary relief;
>
> (3) that the balance of equities tips in her favor; and
>
> (4) that an injunction is in the public interest.

*Id.* at 20.  The plaintiff has "the burden of persuasion on all four elements."  *Planned Parenthood
of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (quotations omitted).

### B.  Gonzalez Is Likely to Succeed on the Merits of Her Administrative Procedure Act
### Claim

Gonzalez challenges the Department's interpretation of "foreign language" in section
2452(b)(6) as being inconsistent with the Fulbright-Hays Act.  Mot. at 23–31.  In other words,

---

not damages." *Am's Cmty.*, 200 F.3d at 829.  And it's true that Gonzalez is seeking Fulbright-Hays
Fellowship money, and that she likely "doesn't care whether" the Department pays her from 2023
appropriations or some other source.  *See Modoc Lassen*, 881 F.3d at 1196.  But that is of no moment
here.  "[T]he fungibility of money can easily obscure the difference between (1) relief that seeks to
compensate a plaintiff for a harm by providing a substitute for the loss, and (2) relief that requires a
defendant to transfer a specific *res* to the plaintiff."  *Id.* (cleaned up).  As explained, the specific *res*
Gonzalez seeks for her 2022 application is gone.

Gonzalez argues that the Department exceeded its statutory authority when it interpreted "foreign language" to mean a language foreign to the applicant rather than foreign to the United States. *See, e.g.*, *id.* at 24–26; *see also* 5 U.S.C. § 706(2)(C) (providing that a court must "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory . . . authority")

More specifically, Gonzalez makes two arguments.  She first claims that Congress never authorized the Department "to make rules carrying the force of law" with respect to the Fulbright-Hays Fellowship, so the Department's interpretation of "foreign language" in section 2452(b)(6) should not receive *Chevron* deference.  Reply at 7 (quoting *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 454 (5th Cir. 2008)); Mot. at 26 (citing *United States v. Mead Corp.*, 533 U.S. 218, 231 (2001)).  She then contends that even if the Department could issue legally binding regulations, the Department's interpretation of "foreign language" conflicts with section 2452(b)(6)'s unambiguous terms and thus fails the *Chevron* test.  Reply at 7–8; Mot. at 24–26.  The Department counters that its interpretation of "foreign language" in section 2452(b)(6) "is consistent with its meaning in the underlying statute" and thus warrants *Chevron* deference.  Resp. at 22.

Federal administrative agencies, like the Department, operate under authorities Congress grants to them.  Quite often, agencies must interpret the statutes Congress has tasked them with administering.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 (1984).  In turn, litigants often ask federal courts to decide whether an agency's interpretation of a statute is lawful.

The APA requires courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, [] otherwise not in accordance with law . . . [or] in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C); *see also Chevron*,

467 U.S. at 844 (explaining that any regulation that is "arbitrary, capricious, or manifestly contrary to the statute" is not to be "given controlling weight").  To decide whether to set aside an agency's interpretation of a statute, courts principally look to two leading Supreme Court cases and their progeny: *Mead* and *Chevron*.

*Mead* requires courts to ask a threshold question: Did Congress grant the agency power to make binding rules in the first instance?  *Mead*, 533 U.S. at 226–27.  If the answer is "yes," courts then evaluate whether to defer to the agency's interpretation of the statute it administers.[37] *Chevron*, 467 U.S. at 842–45.

The rule of deference to an agency's interpretation recognizes that agencies are often better equipped than generalist courts to determine what a particular statutory provision means.[38] *See Chevron*, 467 U.S. at 844.  For example, if an issue is scientific or technical, agency experts may well have the knowledge necessary to produce effective rules implementing Congress's policy goals.  *E.g.*, *Sierra Club v. EPA*, 939 F.3d 649, 680 (5th Cir. 2019) ("A reviewing court must be most deferential to an agency where . . . its decision is based upon its evaluation of complex scientific data within its technical expertise." (cleaned up)); *West Virginia*, 142 S. Ct. at 2642–43 (Kagan, J., dissenting).  The *Chevron* Court recognized as much:

> the principle of deference to administrative decisions has long been consistently followed by [courts] whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of

---

[37] Other leading cases, which are not relevant here, guide courts when the answer to the threshold question is "no."  *See, e.g.*, *Mead*, 533 U.S. at 227–28, 234–35 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

[38] Deference also recognizes that Congress often writes statutes with flexibility so the government can quickly adapt to changing circumstances.  *E.g.*, *Texas v. United States*, 497 F.3d 491, 504 (5th Cir. 2007) (Jones, J.) ("When it so desires, Congress has the power to confer expansive interpretive authority on agencies to accommodate changing or unpredictable circumstances."); *West Virginia v. EPA*, 142 S. Ct. 2587, 2642–43 (2022) (Kagan, J., dissenting).

the statutory policy in a given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.

*Chevron*, 467 U.S. at 844 (quotation omitted).  Hence, we have *Chevron* deference.  When deciding whether to ultimately defer to an agency's interpretation courts apply the *Chevron* two-step framework: First, "is the question whether Congress has directly spoken to the precise question at issue," which requires a court to determine whether the relevant statute is silent or ambiguous about the issue.  *See id.* at 842–43.  If the statute is silent or ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.

At the same time, the Supreme Court has recognized that sometimes an agency's interpretation of a statute is so misguided that it conflicts with Congress's express intent, in which case a court must set aside the agency's interpretation.  *See, e.g.*, *id.* at 842–43 ("If the intent of Congress is clear that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("Even under *Chevron*'s deferential framework, agencies must operate within the bound of reasonable interpretation." (quotation omitted)).

### 1. Congress Delegated Binding Rulemaking Authority to the Department and the Department Promulgated the Foreign-Language Criterion in Exercise of Its Authority

To qualify for *Chevron* deference—or, more precisely, the application of the *Chevron* two-step framework—Congress must have "delegated authority to the agency generally to make rules carrying the force of law,"[39] and "the agency interpretation claiming deference [must have

---

[39] Rules that carry the force of law are often called "legislative rules."  *E.g.*, *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (Kavanaugh, J.) (quoting *INS v. Chadha*, 462 U.S. 919, 986 n.19 (1983)).  Less often, they are called "substantive rules."  *Texas v. United States*, 787 F.3d 733, 762 (5th Cir. 2015) (describing agency legally binding agency rules as "substantive").

been] promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27; *see also Sierra Club v. Trump*, 929 F.3d 670, 692 (9th Cir. 2019) (explaining that "[t]o determine whether the *Chevron* framework governs at all," a court must first apply the "'step zero' inquiry" the Supreme Court announced in *Mead*).

There's a particularly strong signal that Congress intended an agency to have the authority to issue legislative rules: notice-and-comment rulemaking authority.[40] *See, e.g.*, *Mead*, 533 U.S. at 227, 229–31; *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799, 805 (5th Cir. 2010). But Congress does not always explicitly authorize an agency to issue regulations after notice-and-comment. That does not, however, always end the inquiry, as "some other indication of comparable congressional intent" can show that Congress intended to give an agency legislative rulemaking authority. *Mead*, 533 U.S. at 227.

The Court now turns to the Fulbright-Hays Act. In section 2452, Congress did not explicitly authorize the Department to promulgate rules and regulations. *Compare* 22 U.S.C. § 2452 (authorizing the President to establish exchanges for "promoting modern foreign language training and area studies in United States schools," without mentioning regulations), *with* 22 U.S.C. § 2258a(c) (authorizing the Secretary of State "to promulgate regulations for the purposes of this section"). Even so, Congress commanded the Department "*to provide*

---

Legislative rules "purport[] to impose legally binding obligations or prohibitions on regulated parties." *McCarthy*, 758 F.3d at 251–52; *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("Substantive or legislative rules are those that grant rights, impose obligations, or produce other significant effects on private interests." (quotation omitted)). For example, a legislative rule might establish "substantive standards by which [an] agency evaluates applications which seek a benefit that the agency has the power to provide." *See Texas*, 787 F.3d at 766 (cleaned up).

[40] Notice-and-comment rulemaking, however, is not a necessary condition for *Chevron* deference. *See, e.g.*, *Barnhart v. Walton*, 535 U.S. 212, 221–22 (2002) (looking to certain factors to decide that the agency's interpretation, "reached . . . through means less formal than 'notice and comment' rulemaking," should nonetheless be given *Chevron* deference); *Texas v. United States*, 809 F.3d 134, 178 n.160 (5th Cir. 2015).

*for* . . . [exchanges for] promoting modern foreign language training . . . in United States schools." 22 U.S.C. § 2452(b)(6) (emphasis added).

But Congress provided only skeletal details about its desired foreign language exchanges. *See id.* To give substance to Congress's authorization, the Department necessarily had to detail the parameters of any foreign language exchange it established. *See* 34 C.F.R. Part 662. Congress thus, at minimum, implicitly gave the Department the authority to make legislative rules implementing section 2452(b)(6).[41] *Cf. White v. Scibana*, 390 F.3d 997, 1000–01 (7th Cir. 2004) (explaining agency had "implicit in its authority" the "discretion to resolve ambiguities" through notice-and-comment rulemaking); *Leyse v. Clear Channel Broad., Inc.*, 545 F. App'x 444, 452–53 (6th Cir. 2013) (concluding Congress authorized agency to conduct notice-and-comment rulemaking even though statute did not explicitly confer such authority); *cf. also Barnhart*, 535 U.S. at 222 (deferring to agency's interpretation that did not go through notice-and-comment rulemaking but, among other things, answered an "interstitial . . . legal question" and was "important[t] . . . to administration of the statute"). In other words, Congress's use of "to provide for" implicitly shows "comparable congressional intent" that the Department have legislative rulemaking authority. *See Mead*, 533 U.S. at 227–26.

That the Department issued the Fulbright-Hays Fellowship regulations pursuant to notice-and-comment procedures reinforces this conclusion. *See* 63 Fed. Reg. 46,358, 46,358 (1998) (reviewing regulatory procedural background). While Congress's provision of notice-and-

---

[41] Though the Court need not decide so here, Congress arguably gave the Department *explicit* authority to implement section 2452 through binding rules and regulations because it—in no uncertain terms—authorized the Department "to provide for" foreign language exchanges. 22 U.S.C. § 2452(b)(6). Congress's use of "to provide for," along with the lack of statutory detail, likely shows explicit "comparable congressional intent" to give the Department authority to make rules carrying the force of law. *See Mead*, 533 U.S. at 227–26.

comment rulemaking authority is the strongest signal of legislative rulemaking authority, an agency's use of notice-and-comment procedures can indicate legislative rulemaking authority. *See, e.g.*, *Freeman*, 626 F.3d at 805 ("Where the agency has not used a deliberative process such as notice-and-comment rulemaking, . . . the court cannot presume Congress intended to grant the interpretation the force of law."); *Swallows Holding, Ltd. v. C.I.R.*, 515 F.3d 162, 169–71 (3d Cir. 2008) (applying *Chevron* to an agency's interpretive rule because "the Secretary opened the rule to public comment, [which is] a move that is indicative of agency action that carries the force of law").

The Department's use of notice-and-comment rulemaking authority also answers the second question in *Mead*.  The Department promulgated the Fulbright-Hays Fellowship regulations under the rulemaking authority Congress granted it.  Thus, the Court will apply *Chevron*'s two-step framework to the Department's interpretation of "foreign language."  *See Mead*, 533 U.S. at 226–27 ("[T]he agency interpretation claiming deference [must have been] promulgated in the exercise of that authority."); *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980–81 (2005); *see also Nat'l Mining*, 758 F.3d at 251 ("Legislative rules generally receive *Chevron* deference.").

### 2.  *Whether the Court Should Defer to the Department's Interpretation*

The *Chevron* two-step (in greater detail): At step one, a court "ask[s] 'whether Congress has directly spoken to the precise question at issue.'"  *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 460 (5th Cir. 2020) (quoting *Chevron*, 467 U.S. at 842).  Step one, in other words, requires a court to determine "if the statute is 'truly ambiguous,'" *id.* (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)), such that the agency had room to "formulat[e] policy and [] mak[e] rules to fill any gap left, implicitly or explicitly, by Congress," *Chevron*,

467 U.S. at 843 (quotation omitted).  Only if the statute is ambiguous can a court move to step

two.  *Gulf Fishermens*, 968 F.3d at 460.  At step two, a court asks "whether the agency's

construction is permissible."  *Id.* (cleaned up).  "A permissible construction is one that

reasonably accommodates conflicting policies that were committed to the agency's care by the

statute."  *Id.* (cleaned up).

### a.  "Foreign Language" Is Not Ambiguous

Step one brings the Court to the familiar land of statutory interpretation.  Courts do "not

defer to 'an agency interpretation that is inconsistent with the design and structure of the statute

as a whole.'"  *Gulf Fishermens*, 968 F.3d at 460 (quoting *Util. Air*, 573 U.S. at 321).  So the

Court must "'exhaust all the traditional tools of construction,' including 'text, structure, history,

and purpose,'"—and, of course, context—to determine whether Congress has answered the

question at issue or the statute is "truly ambiguous."  *Id.* (quoting *Kisor*, 139 S. Ct. at 2415).

Begin with the text.  *E.g.*, *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 242 (5th Cir.

2022) (quoting *Murphy v. Smith*, 138 S. Ct. 784, 787 (2018)).  Recall that Congress authorized

the Department to establish exchanges

> promoting modern *foreign language* training and area studies in United States
> schools, colleges, and universities by supporting visits and study in foreign
> countries by teachers and prospective teachers . . . for the purpose of improving
> their skill in languages and their knowledge of the culture of the people of those
> countries . . . .

22 U.S.C. § 2452(b)(6) (emphasis added).  Congress did not define "foreign language," so the

Court must interpret the term in accordance with its plain, "ordinary, contemporary, common

meaning."  *E.g.*, *Easom*, 37 F.4th at 242 (quoting *Perrin v. United States*, 444 U.S. 37, 42

(1979)).

But first, a hypothetical.  Assume that a United States citizen of Brazilian descent speaks

three languages: English, Portuguese, and Hungarian.  They are natively fluent in English and

Portuguese.  In a job interview for a position in the United States, the interviewer asks the individual: "Do you speak any foreign languages?"  What is the applicant going to say?  Their most likely response will be: "Yes, I speak Portuguese and Hungarian."  And that's the likely response because, in that context, most people would understand "foreign" to mean "foreign to the United States" or "foreign language" to mean "a language other than English."  That is also how Gonzalez understands it.

      If the Department were presented with the same question though, it would say, "Yes, I speak Hungarian."  If that sounds strange, it's because it is.  The Department interprets "foreign language" to mean a language that is foreign to the applicant.  Resp. at 23–25.  That is, a foreign language, according to the Department, is any non-native language the applicant speaks.  34 C.F.R. § 662.21(c)(3) (providing that Fulbright-Hays Fellowship applicants are assessed for their "proficiency in one or more . . . languages (other than English *and the applicant's native language*)" (emphasis added)).

      "Foreign" can mean several things including, "born in, belonging to, or characteristic of some place or country other than the one under consideration,"[42] "belonging to another; not one's own,"[43] or "of, from, in, or characteristic of a country or language other than one's own."[44]

---

[42] *Foreign*, Merriam-Webster Online (last visited Mar. 9, 2023), *available at* https://www.merriam-webster.com/dictionary/foreign.

[43] *Foreign*, Oxford English Dictionary Online (last visited Mar. 9, 2023), *available at* https://www.oed.com/view/Entry/73063?rskey=VtY067&result=2&isAdvanced=false#eid.

[44] *Foreign*, The Oxford Pocket Dictionary of Current English (Oxford Univ. Press) (May 18, 2018), *available at* https://www.encyclopedia.com/social-sciences-and-law/law/law/foreign.  The definition of "foreign" has not changed much.  For example, in 1961—the year Congress passed the Fulbright-Hays Act—Webster's defined "foreign" as, among other things, "situated outside a place or country," "situated outside one's own country," "born in, belonging to, derived from, intended for, or characteristic of some place or country (as nation) other than the one under consideration," and "related to or dealing with other nation."  *Foreign*, Webster's Third New International Dictionary (1961).

These definitions show that the meaning of "foreign" is context dependent.  It can take on a meaning relative to a place (say, the United States) or a person (say, yourself).  So both Gonzalez and the Department are right in that "foreign language" *could* mean a language foreign to the United States (e.g., anything other than English)[45] or foreign to the applicant (e.g., anything other than English or Portuguese).  The dictionary definitions of "foreign" do not provide an adequate answer to the question of what Congress meant by "foreign language" in the Fulbright-Hays Act.

Nor should we necessarily expect them to.  Dictionaries are mere tools.  A court's "duty, after all, is to construe statutes, not isolated provisions" or words.  *King v. Burwell*, 576 U.S. 473, 486 (2015) (quotation omitted).  "So when deciding whether the language is plain, [courts] must read the words 'in their context and with a view to their place in the overall statutory scheme.'"  *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000)).  In fact, "a word with many dictionary definitions"—like "foreign"—"must draw its meaning from its context."  *See Gulf Fishermens*, 968 F.3d at 463 (cleaned up).

Section 2452(b)(6) speaks of supporting students' "visits and study in *foreign countries* . . . for the purpose of improving their skill in language and their knowledge of the culture of the people *of those countries*."  24 U.S.C. § 2452(b)(6) (emphasis added).  Congress's use of "foreign" in this context clearly means "other than the United States."  What else would

---

[45] The Court recognizes the United States does not have a national language.  This Court, for instance, sits in El Paso, TX.  No one could fairly say that Spanish is foreign to El Paso.  But the question in this case is about a congressional statute that covers the whole United States.  It's proper to ask, in that circumstance, about "foreign" relative to the United States, not relative to particular areas of the United States.  In fact, when referencing the whole of the United States the federal government assumes English is the primary language.  For example, a judicial officer must provide interpretation services if he "determines . . . that [a] party . . . or a witness . . . speaks only or primarily a language other than the English language."  28 U.S.C. § 1827(d)(1)(A); *see also Arteaga v. Cinram-Technicolor*, No. 3:19-CV-00349, 2020 WL 1905176, at *1 (M.D. Tenn. Apr. 17, 2020) ("Federal court filings must be in English, and documents written in another language must be filed with a translation.").

be a "foreign country" to Congress?  That suggests that "foreign," as used in "foreign

language"—which is in the same subparagraph as "foreign countries"—likely also means foreign

to the United States—that is, a language other than English.  *See CSX Corp. v. United States*, 18

F.4th 672, 680 (11th Cir. 2021) (describing the consistent-usage canon as "stat[ing] that a 'word

or phrase is presumed to bear the same meaning throughout the text.'" (quoting ANTONIN SCALIA

& BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 25, at 170

(2012))).[46]

Broader context confirms this reading.  Section 2452 speaks entirely of the United States

in relation to other countries.  *See, e.g.*, 22 U.S.C. § 2452 (using the phrase "between the United

States and other countries" five times).  It also speaks of "international cooperative relations"

and gives the President—who exercises broad foreign affairs power, *see, e.g.*, *Zivotofsky ex rel.*

*Zivotofsky v. Kerry*, 576 U.S. 1, 13–17 (2015)—the authority to conduct several activities related

to fostering the United States' relationship with other countries, 22 U.S.C. § 2452(b).

Defining "foreign" as "foreign to the United States" also aligns with the Fulbright-Hays

Act's stated purpose, which is, in part, "to enable the Government of the United States to

increase mutual understanding between the people of the United States and the people of other

countries by means of educational and cultural exchange."[47]  22 U.S.C. § 2451.  The Fulbright-

---

[46] *See also Genus Lifesciences, Inc. v. Azar*, 486 F. Supp. 3d 450, 460 (D.D.C. 2020) ("[I]dentical phrases in close proximity are, in particular, presumed to share the same meaning.").

[47] In full:

The purpose of this Act is to enable the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange; to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interests, developments, and achievements of the people of the United States and other nations, and the contributions being made towards a peaceful and more fruitful life for people throughout the world; to promote international cooperation for educational and cultural advancement; and thus to

Hays Fellowship is one of those educational and cultural exchanges.  *See generally* 22 U.S.C. § 2452(b)(6); 63 Fed. Reg. 46,358 (1998).

Finally, legislative history confirms that Congress unambiguously intended "foreign language" to mean any language other than English.[48]  Take this statement from the 1961 House Report—produced by the Committee on Foreign Relations—discussing the importance of the educational and cultural exchanges to be established by the Fulbright-Hays Act: "In the current struggle for the minds of men, no other instrument of foreign policy has such great potential."  H. REP. NO. 87-1094, at 1–2 (1961), *as reprinted in* 1961 U.S.C.C.A.N. 2759, 2759.  The context here, of course: the Cold War.  More specific to this case, the Committee described section 2452(b)(6) as "a new authority that gives recognition to the importance of improving understanding and communication *between the people of the United States and foreign nationals*."  *Id.* at 7 (emphasis added).  The Senate agreed.  Describing section 2452(b)(6), the Senate Committee on Foreign Relations said, "In developing language skills there is no real substitute for visiting and studying in the country where the language is used."  S. REP. NO. 87-372, at 10–11 (1961).

Given the text, context, purpose, and history, the Court concludes that Gonzalez is likely to show that Congress intended "foreign language" to mean a language other than English.  The Fulbright-Hays Act is unlikely to be "truly ambiguous" and the Department's interpretation of

---

assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world.

Pub. L. No. 87-256, § 101, 75 Stat. 527, 527.  Notably, Congress's stated purpose has stayed the same, despite intervening amendments to the Act.  *Compare* Pub. L. No. 87-256, 75 Stat. 527, 527 (1961), *with* 22 U.S.C. § 2451.

[48] *See Bolen v. Dengel*, 340 F.3d 300, 310 (5th Cir. 2003) (looking to legislative history in a *Chevron* deference case).

"foreign language" is likely "inconsistent with the design and structure of the statute as a whole." *See Gulf Fishermens*, 968 F.3d at 460.  The Court thus cannot defer to the Department's interpretation.  *See id.*

### b.  The Department's Arguments to the Contrary are Unpersuasive

The Department cannot save the Foreign-Language Criterion.  The Department begins by declaring that "'foreign language' is ambiguous at best."  Resp. at 23.  But the Department provides little support for its declaration.  It first seizes on the definition of "foreign" that defines the term as "of, from, in, or characteristic of a country *or language other than one's own*."[49]  The thing is, dictionary definitions can only go so far.  For example, in this case, for every dictionary definition the Department has to support its position, Gonzalez has one that counters.[50]  That stalemate does not exactly push the case forward.

So the Department jumps to context, arguing that it confirms "the reasonableness of the Department's interpretation."  Resp. at 24.  It contends that the words surrounding "foreign language"—"*promoting* modern foreign language *training*," 22 U.S.C. § 2452(b)(6) (emphasis added)—show that the Department's authority encompasses promoting the *acquisition* of a *new* language—that is, a non-native language, Resp. at 24–25.[51]  If that's true, the Department

---

[49] *Foreign*, The Oxford Pocket Dictionary of Current English (Oxford Univ. Press) (May 18, 2018), *available at* https://www.encyclopedia.com/social-sciences-and-law/law/law/foreign (emphasis added).

[50] *Compare* Mot. at 25 (arguing "foreign" means "characteristic of some place or country other than the one under consideration" (quotation omitted)), *with* Resp. at 23 (arguing "foreign" means "of, from, in, or characteristic of a country or language other than one's own" (quotation and emphasis omitted)).

[51] The Department argues that "promoting" and "training" can be combined to reach this conclusion.  Specifically, the Department argues that because "promote" means "to bring or help bring about" or "encourage," and "training" means "the skill, knowledge, or experience *acquired* by one that trains," section 2452(b)(6) can reasonably be read to mean Congress intended any foreign language exchange established under section 2452(b)(6) to be about "the acquisition of non-native language skills."  Resp. at 24.

argues, then "foreign language" can reasonably mean a language foreign to the Fulbright-Hays Fellowship applicant. *Id.* Not so. While the Department certainly has the authority to promote foreign language training, its authority does not go as far as it contends. Given the common understanding of "foreign language," the broader context that unambiguously speaks in terms of the United States in relation to other countries, and legislative history, the Department's search for ambiguity falls short.

Moreover, with respect, the Department's reasoning strikes the Court as dubious. The Department's argument seems to rest on the proposition that the Fulbright-Hays Fellowship will motivate people to acquire skills in a new language. But the Fulbright-Hays Fellowship is for *graduate* students. Historically, it pays around $35,000.[52] Not an insignificant amount, but in the broader context of higher education, also not that much.[53] With that, the Court doubts the proposition that people are deciding to learn a new language early enough—so that they have sufficient proficiency in the language to be competitive for a fellowship—simply so they might get a Fulbright-Hays Fellowship in graduate school.

Finally, the Department says its 60+ years of experience administering the Fulbright-Hays Fellowship led it to the understanding that "scarce resources are best directed to promoting acquisition of language skills." Resp. at 25. Putting aside the Court's skepticism about the Department's premise, the Court is not persuaded that the Department's experience and relevant expertise overrides the unambiguous meaning of "foreign language." And it is hard to see how it could. *Cf. Kisor*, 139 S. Ct. at 2414–15 (discussing relevance of agency expertise to deference

---

[52] *See* U.S. Dep't of Educ., *Fulbright-Hays—Doctoral Dissertation Research Abroad: FundingStatus* (last visited Mar. 15, 2023), https://www2.ed.gov/programs/iegpsddrap/funding.html.

[53] The Court recognizes too that there is a qualitative value in obtaining a Fulbright-Hays Fellowship.

but maintaining there is no deference unless there "is genuine[] ambigu[ity]").  Moreover, the consideration of an agency's policy choices is better left for the second step of *Chevron*, *see Chevron*, 467 U.S. at 843–44, 863–64, which the Court does not reach.

## C.  Gonzalez Is Likely to Suffer Irreparable Harm without Preliminary Relief

To establish the likelihood of irreparable harm, a "plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."  *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986); *see also Louisiana v. Ctrs. Disease Control & Prevention*, 603 F. Supp. 3d 406, 439–40 (W.D. La. 2020) (citing *Humana*).  Although the Department has decided to reduce the value of the Foreign-Language Criterion from 15 points to one point, Gonzalez still carries her burden to show a likelihood of irreparable injury.[54]

Begin with the fact that the Department awards relatively few Fulbright-Hays Fellowships each year.  *See* U.S. Dep't of Educ., *Fulbright-Hays—Doctoral Dissertation Research Abroad: Funding Status* (last visited Mar. 15, 2023), https://www2.ed.gov/programs/ie gpsddrap/funding.html (awarding an average of 92 fellowships each year for the last ten years).  Last year, the Department received 177 applicants and awarded only 88 fellowships.  U.S. Dep't of Educ., *Fulbright-Hays—Doctoral Dissertation Research Abroad: Awards* (last visited Mar.

---

[54] In her Reply, Gonzalez contends the Department acted arbitrarily and capriciously by reducing the value of the Foreign-Language Criterion from 15 points to one point without any explanation.  Reply at 13–14.  Under the Fulbright-Hays Act and the Department's own regulations, the Fulbright-Hays Fellowship allows students to "conduct dissertation research abroad in a modern foreign language," 34 C.F.R. § 662.1(b), which (ostensibly) requires fellows to "[p]ossess[] sufficient foreign language skills," *id.* § 662.3(d).  Because the Department's devaluation of the Foreign-Language Criterion inherently devalues Gonzalez's foreign language skills relative to her Fulbright-Hays Fellowship application, Gonzalez maintains she will suffer irreparable harm.

The Court too questions whether the Department has acted lawfully by devaluing the Foreign-Language Criterion without explanation.  But the Court does not reach the issue because it does not have before it adversarial argument on the issue.  *E.g.*, *Sylvia v. Wisler*, 875 F.3d 1307, 1325 (10th Cir. 2017) (declining to reach an issue in the "absence of meaningful adversarial briefing").

15, 2023), https://www2.ed.gov/programs/iegpsddrap/awards.html (see document under "FY 2022").  Pre-COVID, the Department received substantially more applications but still awarded fellowships at nearly the same rate.  *Compare, e.g.*, *id.* (see document under "FY 2016"), *with* U.S. Dep't of Educ., *Fulbright-Hays—Doctoral Dissertation Research Abroad: Funding Status* (last visited Mar. 15, 2023), https://www2.ed.gov/programs/iegpsddrap/funding.html (awarding 92 fellowships in FY 2016).  All this to say, getting a Fulbright-Hays Fellowship is highly competitive.  *See, e.g.*, Mot. at 12–13 (discussing the "competitive nature" of the Fellowship); Am. Compl. ¶ 27 (similar).

Thus, even a one-point difference could make or break Gonzalez's chance of obtaining a Fulbright-Hays Fellowship, although this depends on the number of applicants and the strength of their applications.  *Cf.* Compl. ¶¶ 25, 27 (describing the 5-point automatic deduction for "heritage speakers" as a "significant penalty").  The Department does not really push back on this.  In fact, the Department—while recognizing Gonzalez is *guaranteed* to lose one point as a native Spanish speaker—says that Gonzalez's harm "would be minimal at best."  Resp. at 27.  But guessing that Gonzalez might suffer minimal harm—which does not necessarily mean the harm is not irreparable—cannot outweigh the fact that Gonzalez has carried her burden to show that she is under "a significant threat of injury" and "that the injury is imminent."[55]  *See Humana*, 804 F.2d at 1394.

Without preliminary relief, Gonzalez is guaranteed to lose one point on her 2023 Fulbright-Hays Fellowship application for being a native Spanish speaker and, in a competitive

---

[55] Money damages are unavailable in this APA action.  *See supra* Section II; 5 U.S.C. § 702 (limiting a court's review of agency action to cases in which plaintiffs "seek[] relief other than money damages"); *see also Humana*, 804 F.2d at 1394 (requiring a plaintiff seeking a preliminary injunction to show "that money damages would not fully repair the harm").

field, one point could make the difference.  Gonzalez has thus shown she is likely to suffer

irreparable harm in the absence of preliminary relief.

## D.  The Balance of Equities and the Public Interest

Two factors remain: whether "the balance of equities tips in [Gonzalez's] favor" and

whether "an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  These final factors

"overlap[] considerably" and so courts often consider them together.  *See, e.g.*, *Texas*, 809 F.3d

at 187 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  In fact, in this context, where the

Government is the opposing party, "[t]hese factors merge."  *Nken*, 556 U.S. at 435.  "In weighing

equities, [the] [C]ourt 'must balance the competing claims of injury and must consider the effect

on each of the granting or withholding of the requested relief.'"  *Texas v. United States*, 524 F.

Supp. 3d 598, 663 (S.D. Tex. 2021) (quoting *Winter*, 555 U.S. at 24).

The Department contends that "a preliminary injunction would undermine the regulatory

process that is already underway to assess the Foreign-Language Criterion."  Resp. at 31.  As

Gonzalez points out, Reply at 13, the Department cites zero authority for this proposition, *see*

Resp. at 31–32.  It also makes little sense.  The Court does not see—and the Department does not

explain—how invalidating the Foreign-Language Criterion interferes with or prevents the

Department from going through the notice-and-comment process.  *See Texas v. United States*, 40

F.4th 205, 220 (5th Cir. 2022) ("Apart from the constitutional or statutory basis on which [a]

court invalidate[s] an agency action, vacatur neither compels nor restrains further agency

decision-making.").

Nor will striking down the Foreign-Language Criterion disrupt the Department's review

of 2023 Fulbright-Hays Fellowship applications.  The application window remains open, 88 Fed.

Reg. 8832, 8832 (2023) (application deadline: Apr. 11, 2023), and the Department has conceded

the review process takes some time, *see* Advisory, ECF No. 29, at 3 ("[The] application and review process will take approximately seven months.").  Finally, and most importantly, the Department has no interest in enforcing a regulation that likely conflicts with Congress's unambiguous statutory mandate.  *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618–19 (5th Cir. 2021) ("Any interest [the agency] may claim in enforcing an unlawful . . . [agency action] is illegitimate.").  In sum, the balance of equities favors Gonzalez.

## IV.    CONCLUSION

The Court **GRANTS IN PART and DENIES IN PART** Plaintiff Veronica Gonzalez's "Motion for Preliminary Injunction" (ECF No. 25).  The Court **DENIES** her requested relief as to her 2022 Fulbright-Hays Fellowship application, but **GRANTS** her requested relief as to her 2023 application.  Consequently, the Court **VACATES** 34 C.F.R. § 662.21(c)(3) as to all 2023 Fulbright-Hays Fellowship applicants until the Court reaches a merits decision in this case or the U.S. Department of Education publishes a final rule amending 34 C.F.R. § 662.21(c)(3).[56]

The Court does not reach Gonzalez's claim that the Foreign-Language Criterion violates the United States Constitution's due process and equal protection guarantees.  *See* Mot. at 16–23. With the Foreign-Language Criterion set aside, Gonzalez obtains the relief she seeks, and "[i]t goes without saying that constitutional questions should be avoided if there are independent 'grounds upon which the case may be disposed of.'"  *Teltech Sys., Inc. v. Bryant*, 702 F.3d 232, 235 (5th Cir. 2012) (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936)).

---

[56] Gonzalez requested that the Court enjoin the Department from applying 34 C.F.R. § 662.21(c)(3) to all applicants in the 2023 application cycle. Mot. at 35. The Department did not challenge the scope of Gonzalez's requested relief. *See generally* Resp. The Court enters Gonzalez's requested relief. *Cf. Texas*, 809 F.3d at 188.

So ORDERED and SIGNED this 24th day of March 2023.

_____
**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**